William A. Smelko (Bar No. 96970)
E-mail: bill.smelko@procopio.com
Maria K. Pum (Bar No. 120987)
E-mail: maria.pum@procopio.com
PROCOPIO, CORY, HARGREAVES &
  SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorneys for Creditor, Janet H. Simkins

# UNITED STATES BANKRUPTCY COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE COUNTY

| | |
|---|---|
| In re: | BK Case No. 6:25-bc-12353-SY |
| DAVID ROBERT STONE, dba CORNERSTONE FINANCIAL SERVICES | Chapter 7 |
| | Adv. No. _____ |
| Debtor. | COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT UNDER 11 U.S.C. § 523(a)(2)(A) (FRAUD); § 523(a)(4) (LARCENY); AND § 523(a)(6)(WILLFUL AND MALICIOUS INJURY-ELDER ABUSE); |
| JANET H. SIMKINS, as an individual and as Trustee of the JANET H. SIMKINS SURVIVOR'S TRUST, | Judge:   Hon. Scott H. Yun |
| Plaintiff | |
| v. | |
| DAVID ROBERT STONE, | |
| Defendant | |

Plaintiff JANET H. SIMKINS, in her capacities as an individual and as Trustee
of the JANET H. SIMKINS SURVIVOR'S TRUST (in either or both capacities, called
"Plaintiff") brings the following "Complaint for Non-Dischargeability of Debt under
11 U.S.C. § 523(a)(2)(A)(Fraud); § 523(a)(4) (Larceny); and § 523(a)(6)(Willful and

1

Malicious Injury-Elder Abuse)" against Defendant DAVID ROBERT STONE ("Defendant" or "Debtor") as follows:

## PRELIMINARY ALLEGATIONS

1.     Plaintiff hereby consents to the entry of final order or judgment by the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 7008.

2.     At all times relevant, Plaintiff, was and is, an individual over the age of 18 and resident of the City of Coronado, County of San Diego, State of California.

3.     Plaintiff is informed and believes, and thereon alleges, that Defendant, was and is, a resident of County of Riverside, State of California. Plaintiff is further informed and believes, and thereon alleges, that Defendant, was and is, the principal of CORNERSTONE FINANCIAL SERVICES ("CFS") which is a "dba" of Defendant and is therefore legally indistinguishable from Defendant other than for narrative purposes.  In truth, CFS and the Debtor are alter egos of one another.

4.     Plaintiff is informed and believes that Cornerstone Financial Services, as well as other entities operated by the Defendant, namely Calzona Truck Sales, Inc. and Stoneway Capital Corporation, are not and were not operated as sole proprietorships.

5.     Any and all debts determined to be owed to Plaintiff by CFS, Calzona Truck Sales, Inc. and Stoneway Capital Corporation are not dischargeable as being debts of a corporate entity.

6.     Plaintiff is listed among "Creditors Who Have Claims Secured by Property" on Defendant's Bankruptcy Schedule D. *See* Dkt. No. 1; page 20 of Schedule D.

7.     Plaintiff will timely file a Proof of Claim in the Bankruptcy Case.

## VENUE AND JURISDICTION

8.     This action is a core proceeding arising in or related to a case under Chapter 7 of the United States Bankruptcy Code, and this Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT

CASE NO. 24-BK-15641-WJ

9.      Venue is proper in this District and the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409, in that this is a proceeding arising under Title 11 of the United States Code or arising in or related to a case under Title 11 of the United States Code.

10.     This is an adversary proceeding to determine the dischargeability of debt owed to Plaintiff by Defendant pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6).

11.     Plaintiff possesses and timely asserts claims for relief for the non-dischargeability of the entirety of the debt owed to Plaintiff based upon Defendant's fraud, larceny, and willful and malicious injury caused to Plaintiff arising from the fraudulent and deceptive practices intentionally designed by Defendant to induce Plaintiff (and, at the outset, her deceased husband) to loan hundreds of thousands of dollars to Defendant (or to his deceptively-named dba, "Cornerstone Financial Services") with no intention or means to repay the principal sums loaned to or placed with the Debtor.  The Debtor's scheme involved a series of representations made to Plaintiff that Defendant knew to be false when he made them, including (a) that the loans to or funds placed with the Defendant were fully secured by or represented the purchase of certain truck leases referred to by Defendant as "Equipment Financing Agreements" ("EFAs") or Equipment Lease Agreements ("ELAs") with face amounts at least equal to the amounts loaned to or placed with Defendant; (b) each loan or money placed with CFS was secured by or represented the purchase of discreet EFAs listed on Schedules attached the various notes or instruments delivered to Plaintiff, and (c) Plaintiff (and her now deceased husband) were further protected by one or more "Guaranties" from Defendant which in truth were sham guaranties.

12.     In addition, when various lenders to Defendant began demanding the return of their principal, Defendant enticed Plaintiff to make an additional loan to Debtor in late 2024 in the amount of $200,000 at an increased rate of interest designed

to further entice Plaintiff to make the loan at a time when the Debtor knew he had no means of repaying the loan and had no intention of doing so.

13. The Court set July 21, 2025 as the deadline for the filing of Complaints to determine the dischargeability of debts.

## FACTUAL BACKGROUND

14. Plaintiff is a widow having lost her husband, Harry "Ron" Simkins in 2003. Plaintiff is currently over 80 years old.

15. Plaintiff is the successor in interest to Harry "Ron" Simkins as his heir and/or as the trustee of the Janet H. Simkins Survivor's Trust.

16. The obligations owed by Defendant and CFS (as alter egos of one another) to The Simkins Family Trust, dated March 26, 1997 (as it may have been amended from time to time), are now owned or held by Plaintiff and/or the Janet H. Simkins Survivor's Trust dated December 8, 2003 (as amended from time to time). All assets relating to purchases of EFAs from CFS or loans made to CFS that were originally held in The Simkins Family Trust, dated March 26, 1997 (as it may have been amended from time to time) are now owned or held by Plaintiff and/or the Janet H. Simkins Survivor's Trust dated December 8, 2003 (as amended from time to time).

17. Plaintiff is informed and believes based on marketing materials disseminated by the Debtor that the Debtor formed CFS in the mid to early 1970's.

18. Plaintiff is now aware the CFS was formed by the Debtor as a "dba" of the Debtor, meaning that CFS was just the Debtor "doing business as" Cornerstone Financial Services. Plaintiff was not aware that the Debtor and CFS were one and the same from a legal standpoint until after the Debtor filed its chapter 7 petition.

19. In the mid-1990s, the Debtor solicited what the Debtor referred to as "investments" from individuals by distributing marketing materials, documents identified as a "Prospectus", newsletters and other items promoting the security of

4

the investments and claiming in a 1995 newsletter that CFS was "proud to report a 100% return, and on time, of all contracted proceeds to all Investors."

20.    Among the Prospectuses that Plaintiff is informed and believes were prepared by the Debtor, was a Prospectus received by Plaintiff's now-deceased husband, Harry R. Simkins (aka "Ron Simkins") in 1995, according to Plaintiff's information and belief.  That Prospectus (the "1995 Prospectus") recited under the CFS logo that ""CFS" has prepared the following Prospectus for Ron Simkins" and that it was "Presented by David R. Stone," the Debtor in this case.  A true and correct copy of the 1995 Prospectus is attached hereto as **Exhibit 1** (page 26) and is incorporated herein by this reference.

21.    According to the 1995 Prospectus, "Cornerstone Financial Services ("CFS") has been a commercial Lender [sic] for 20 plus years."  Although the description in the 1995 Prospectus is a little vague, the business model for CFS described in the 1995 Prospectus was that CFS would enter into financing agreements or make loans to what are described as "'B' and 'C' caliber Borrowers." Those loans were then secured by collateral such as equipment (for example, trucks) or occasionally real estate by way of deeds of trust.  These agreements were referred to in the 1995 Prospectus as "simple secure commercial Finance Agreements."

22.    Under the business model described in the 1995 Prospectus, the "commercial Finance Agreements" between CFS and the various "'B' and 'C' caliber Borrowers" (referred to in later documentation as "Equipment Finance Agreements" or "EFAs") were sold to "Investors" after certain initial payments were received by CFS.

23.    According to the Introduction of the 1995 Prospectus:

> CFS has for many years sold a portion of its small paper
> products to Private Investors. Investors can participate in our
> collateral intensive, security enhanced commercial paper as
> an addition to their portfolio and experience secure equity
> investing, fully amortized, with yields consistently at 14%

1    and even higher through compounding.

2    24.    Further with regard to CFS's business model, the 1995 Prospectus

3    stated in the section entitled "Product:"

4    CFS will assign the remaining payments and all its security
5    to the Private Investor through an [sic] Present Value
     Purchase Agreement (contract) (easy to read, two pages in
6    length). . . .

7    . . . .

8    . . . . This is a straight purchase paper or participation
     investment on fully amortized, short term finance
9    Agreements. The Investor begins to realize yield on day one
     of the investment with normal amortized payments, received
10   monthly. The payments are generally pre-determined, equal
11   in size and the rate is fixed.

12   25.    The Debtor represented to Plaintiff and her now-deceased husband that

13   if they placed an investment with CFS, they would be purchasing specific Equipment

14   Finance Agreements from CFS.  The foregoing representation was false and the

15   Debtor knew it to be false each time the representation was made.

16   26.    In the section of the 1995 Prospectus relating to "Risk," the 1995

17   Prospectus gave glowing reports regarding how investments with CFS were superior

18   in terms of returns and even with regard to safety as compared to investments such as

19   Certificates of Deposit given bank failures and the alleged insolvency of the FDIC.

20   The section on "Risk" concludes:

21   Agreement yields have not been lower than 14% throughout
     the nineties, with compounding yields over 20%. Portfolio's
22   [sic] managed by CFS can double in value in five years. Full
     credit presentations are done before a purchase is offered or
23   recommended. The yield return versus the potential risks are
24   high when compared to other investments. ***CFS carries
     sufficient reserves in the event of a liquidated loss.***
25

26   (Emphasis added.)

27   27.    The statement in the Prospectus that CFS carried "sufficient reserves in

28   the event of a liquidated loss" was false and the Debtor knew it to be false when he

included the statement in the Prospectus and/or presented it to Plaintiff and her husband.

28.    Based on the Prospectus and other materials delivered to Plaintiff and/or her husband and based on certain presentations made by the Debtor to Plaintiff and her husband, whereby Plaintiff and her husband were led to believe that they were purchasing specific Equipment Finance Agreements if they became "Investors" with CFS, Plaintiff and her husband in reasonable reliance on those representations from the Debtor agreed to invest monies with CFS.

29.    As a further means to induce Plaintiff and her husband to turn funds over to the Debtor to purportedly purchase EFAs from CFS, the Debtor presented Plaintiff and her now-deceased husband with a document entitled "Guaranty" in June of 1996.  That initial Guaranty was then replaced by a subsequent "Guaranty" dated as of April 28, 1998 (the "1998 Guaranty").  According to a letter from an employee of CFS, Ms. Dawn Stanley, the 1998 Guaranty was essentially the same as the earlier version of the Guaranty from 1996, but the 1998 Guaranty had been revised such that it now included all "prior, current and future Contracts,"  A true and correct copy of the 1998 Guaranty is attached hereto as **Exhibit 2** (page 38) and is incorporated herein by this reference.

## The 1996 Initial Loan and Later Notes

30.    On or about May 14, 1996, in reliance on the representations (and misrepresentations) made by the Debtor to Plaintiff and her husband, Plaintiff and her husband entered in an agreement with CFS (the "1996 Agreement").

31.    Under the 1996 Agreement, CFS promised to hold funds delivered to CFS by "Harry and Janet Simkins" and any income on those funds (all of which were referred to as "Proceeds") in a manner that made them readily available to Harry and Janet Simkins "upon demand or for present value purchase investment opportunities which are offered by CFS."  Furthermore, "[a]ll Proceeds in receipt [were to] bear interest at the rate of 5% (five-percent) annual simple interest,

7

accredited on the basis of a daily equivalent, adjusted quarterly relative to principle balance." A true and correct copy of the 1996 Agreement is attached hereto as **Exhibit 3** (page 41) and is incorporated herein by this reference.

32.    Plaintiff is informed and believes that it was pursuant to the 1996 Agreement that Harry Simkins (also sometimes referred to as Ron Simkins) in his capacity as Trustee of the Simkins Family Trust deposited $100,000 with CFS pursuant to a check dated as of January 22, 1997 (although a notation signed by an employee of CFS, Ms. Dawn Stanley, suggests that the check may have been written on January 22, 1998.) A true and correct copy (with redactions for privacy purposes) of the check dated as of January 22, 1997 (but possibly mis-dated) is attached hereto as **Exhibit 4** (the "1997 Check") (page 43).

33.    The proceeds of the 1997 Check in the amount of $100,000 plus accrued and unpaid interest in an amount according to proof remains unpaid and owing to Plaintiff by the Debtor.

34.    During the course of the relationship between Plaintiff (and her husband before he passed away) on the one hand and CFS on the other, the Debtor (through CFS) promoted further "investment' with or through CFS by sending out newsletters, reports and other communications which touted the returns available to "investors," assured prospective "investors" that their loans were secured by EFAs that they had purchased from CFS, and claimed that during the decades CFS had been in business "all Investors [had been] paid on time and without any losses suffered, ever."

35.    Based on repeated assurances from the Debtor and various marketing materials and presentations, Plaintiff (and her husband before he passed away) were justified in believing that they were fully-secured creditors of CFS.   They also believed based on the Debtor's representations, that the Guaranty provided them with additional security and gave them recourse to means of repayment they otherwise would not have had.  For example, the 1998 Guaranty recited that CFS and

8

the Debtor as "Assignor" purported to agree in favor of "Ronald Simkins, as
Individual or inclusive in any other denomination and now known as Simkins Family
Trust" as "Assignee" to "unconditionally guaranty *against a financial setback of
any kind* by Assignee beyond the receipt monthly of the amortized payment stream
or proceeds or monies due and to become due to Assignee from Assignor as manager
of the Contracts." (Emphasis added.)

36.    In reliance upon the representations and marketing pitches made by the
Debtor to Plaintiff, Plaintiff loaned CFS an additional $250,000 on July 13, 2006 by
way of three checks drawn on separate bank accounts, one from Plaintiff's personal
account and two from accounts held in the name of the Janet H. Simkins Survivor's
Trust. In exchange for Plaintiff's placement of those funds with CFS, the Debtor
caused CFS to deliver to Plaintiff a promissory note dated as of July 15, 2006 in the
face amount of $250,000 payable to "Simkins Family Trust" and bearing interest at
10% per annum (the "$250,000 Note").

37.    The $250,000 Note recited in its heading that it was a "NOTE
SECURED BY EFA Schedule 'A' attached." The "EFA Schedule 'A'" listed five
Equipment Finance Agreements with a "present value" represented on the Schedule
to be equal to $254,903.76. The heading, the list of EFAs and other language of the
$250,000 Note were intentionally designed by the Debtor to give Plaintiff the false
impression that she was a fully secured creditor. Plaintiff reasonably relied on those
representations to her great injury. A true and correct copy of the $250,000 Note,
including the EFA Schedule "A" and copies of the three checks (with redactions for
privacy purposes) that were written to the order of CFS are attached hereto as
composite **Exhibit 5** (page 45) and said exhibit is incorporated herein by this
reference.

38.    Concurrently with the delivery to Plaintiff of the $250,000 Note, the
Debtor also delivered to Plaintiff a new "Guaranty" dated as of July 15, 2006 (the
"2006 Guaranty") a true and correct copy of which is attached hereto as **Exhibit 6**

9

(page 49) and is incorporated herein by this reference. The 2006 Guaranty, as was the case with each of the prior guaranties, was designed by the Debtor to give Plaintiff (and did give Plaintiff) the impression that she had additional security from CFS and the Debtor that supported her existing loan to the Debtor and any future loans. As was the case with the prior guaranties, the 2006 Guaranty stated that Defendant (and CFS) agreed "to unconditionally guaranty against *a financial setback of any kind* by Assignee beyond the receipt monthly of the amortized payment stream or proceeds or monies due and to become due to Assignee from Assignor as manager of the Contracts." (Emphasis added.)

39.    The 2006 Guaranty (and each of the guarantees that preceded it) were "sham" guaranties in that, to the extent they were comprehensible, the Debtor and CFS were guarantying their own obligations to Plaintiff. No additional security was provided by operation of the Guaranties.

40.    The $250,000 Note stated that it would mature and be payable in full in three (3) years. However, the Debtor did not pay off the $250,000 Note, nor did he have any intention of doing so.

41.    Rather than pay off the $250,000 Note it was the Debtor's intention consistent with his deceitfully-crafted "business model" to induce Plaintiff to "roll" the note over into a new payment obligation and defer payoff indefinitely. Furthermore, by repeating his representations to Plaintiff that Plaintiff was fully secured by the EFAs and had additional support from the 2006 Guaranty, the Debtor induced Plaintiff to loan an additional $100,000 to CFS which she did by way of a check dated as of June 27, 2008.

42.    Instead of giving Plaintiff a new note in the amount of $100,000, the Debtor added the additional principal to the principal owing under the $250,000 Note and had CFS execute a new promissory note payable to "Simkins Family Trust." in the amount of $350,000 and dated as of July 1, 2008 (the "2008 Note"). The 2008 Note bore the heading "NOTE SECURED BY EFA Schedule 'A' attached" and

10

attached a list of EFAs with a stated present value of $366,666.00 which were represented to Plaintiff as having been specifically sold or assigned to her to secure the 2008 Note. The heading, the list of EFAs and other language of the 2008 Note were intentionally designed by the Debtor to give Plaintiff the false impression that she was a fully secured creditor. Plaintiff reasonably relied on those representations to her great injury.

43.     The 2008 Note recited that it replaced the $250,000 Note and that the 2008 Note would mature in one (1) year. A true and correct copy of the 2008 Note which listed EFAs together with a copy of the $100,000 check dated as of June 27, 2008 (with redactions for privacy purposes) is attached hereto as composite **Exhibit 7** (page 52) and said exhibit is incorporated herein by this reference.

44.     The 2008 Note was not paid off on July 1, 2009. Instead, the Debtor induced Plaintiff to roll the 2008 over into a new note in the face amount of $350,000 with a maturity date three (3) years thereafter on July 1, 2012. On that date a new $350,000 note was issued, this time payable to Janet Hope Simkins as Trustee of the Janet Hope Simkins Survivor's Trust, again with a maturity date in three years.

45.     This pattern of replacing each note executed in the face amount of $350,000 at or about the time of the stated maturity of the note continued every three years until CFS executed and delivered a promissory note to Plaintiff in the face amount of $350,000 dated as of July 1, 2021 (the "2021 Note").

46.     Each of the notes executed in the face amount of $350,000 (collectively, the "$350,000 Notes"), including the 2021 Note, contained the heading "NOTE SECURED BY EFA Schedule 'A' attached" and a list of EFAs which were represented to Plaintiff as having been specifically sold or assigned to her to secure the applicable note. The headings, the lists of EFAs and other language of each of the $350,00 Notes, including the 2021 Note were intentionally designed by the Debtor to give Plaintiff the false impression that she was a fully secured creditor.

Plaintiff reasonably relied on those representations to her great injury. A true and correct copy of the 2021 Note is attached hereto as **Exhibit 8** (page 56) and said exhibit is incorporated herein by this reference.

47.     Plaintiff is informed and believes that at some point in 2024, "investors" in the Debtor's scheme began to resist rolling notes over into new payment obligations due some years in the future.  These "investors" began to ask for their principal back; for the Debtor to pay notes at maturity.  Plaintiff was unaware of his development at the time.

48.     In October or November of 2024, the Debtor approached Plaintiff to ask her to make another loan to CFS.  This time Debtor offered to give Plaintiff 12% interest on the new loan.  The Debtor once again assured Plaintiff that she would be fully secured by specified EFAs (or, now, ELAs) and by the Guaranty.  Plaintiff agreed to loan CFS an additional $200,000 which CFS or its employees deducted from one of Plaintiff's bank accounts maintained at BNY-Mellon.  In exchange, Plaintiff received a new promissory note in the face amount of $200,000 dated as of November 8, 2024 (the "2024 Note").

49.     As was the case with the other notes delivered to Plaintiff, the 2024 Note was entitled: "NOTE SECURED BY EFA Schedule 'A' attached" and attached a list of EFAs that were represented to Plaintiff as having been being specifically sold or assigned to her to secure the 2024 Note.  The heading, the list of EFAs and other language of the 2024 Note were intentionally designed by the Debtor to give Plaintiff the false impression that she was a fully secured creditor.  Plaintiff reasonably relied on those representations to her great injury. A true and correct copy of the 2024 Note (with redactions for privacy purposes) is attached hereto as **Exhibit 9** (page 59) and is incorporated herein by this reference.

### Use of the IRA

50.     The Debtor's fraudulent and deceitful scheme aimed at siphoning money from unwitting individuals who believed that the loans or "investments" they

COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT

1   made to or with CFS were fully secured by a combination of EFAs specifically

2   assigned or allocated to the and a Guaranty was not limited to direct loans or

3   investments from individuals.

4       51.   The Debtor also promoted a program pursuant to which individuals

5   could use money in Individual Retirement Accounts ("IRAs") to purchase EFAs

6   from CFS.  For example, in a newsletter disseminated to prospective "investors" by

7   the Debtor for the year ending 1995 (the "1995 Newsletter"), the Debtor through his

8   dba, CFS, advertised under the heading "PENSCO Pension Services" that:

> Essentially, you can invest in CFS products with your IRA
> capital and experience our high yields, tax free, until
> retirement disbursement. The transfer entails a small set up
> fee and then an annual charge of 3/10ths (three-tenths) of
> one percent of the account equity. This is one of the smallest
> management fees in the business. Of course our annual
> management fee of zero dollars remains the leader.

A true and correct copy of the 1995 Newsletter is attached hereto as **<u>Exhibit</u>**

**<u>10</u>** (page 61) and is incorporated herein by this reference.  Subsequent

Newsletters continued to promote the use of IRAs to make "investments"

with CFS, stating in a year End Newsletter for 1997, for example, that:

> Our IRA participation continues to expand with many
> Investors rolling over their current account(s) to our IRS
> qualified, self directed custodian, Pensco Pension Services
> based in San Francisco. Now you can earn that consistent
> 14% fixed rate, plus compounding "tax free" until required
> disbursement.

52.   In reasonable reliance on the Debtor's promises of substantial tax-

deferred returns with respect to allegedly fully secured "investments" which were

supported by discrete EFAs assigned or sold to the applicable investor, Plaintiff and

her husband opened an IRA with PENSCO Pension Services ("PENSCO") in 1997.

The initial application for the IRA named the Debtor, David R, Stone, as the

representative of the Plaintiff and her husband for the IRA.

COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT

CASE NO. 24-BK-15641-WJ

53.    Once their IRA account was opened at PENSCO, Plaintiff and her husband caused monies in another individual retirement account maintained at another institution to be rolled over into the new IRA at PENSCO.

54.    The IRA initially established by Plaintiff and her husband at PENSCO (the "IRA") was a self-directed IRA, meaning that the account holder was able to make all investment decisions.  What occurred under the Debtor's scheme was that the Debtor induced Plaintiff and her husband through deceit and fraudulent misrepresentations to allow the Debtor to make the investment decisions using the funds in the IRA in order to place "all investments" with CFS.

55.    The primary vehicle by which the Debtor caused PENSCO to use the funds in the IRA to make "investments" with CFS, were agreements, each entitled "Participation and Security Agreement" ("PSA").  Each PSA would relate to a particular "Equipment Finance Agreement" (later sometimes called an "Equipment Lease Agreement") naming a particular borrower under the EFA—typically in Plaintiff's case, the lessee of a truck from CFS.  The PSA would recite, for example, that in exchange for a stated sum (which was deducted from the IRA), CFS "hereby assigns, transfers and sets over to Pensco Trust Co. FBO Janet Simkins ("Assignee") a divided participation ("Participation") in all remaining full rental payments ("Proceeds") now due and/or hereafter to become due to [CFS]" from the named lessee.  The PSA would specify an interest rate payable to Plaintiff.

56.    Each PSA used to document withdrawals from the IRA to "invest" with CFS recited that Plaintiff was secured.  The PSA would provide more or less as follows:

> As security for the performance of all obligations of the Debtor under the EFA. Assignor hereby grants Assignee a security interest in and a lien on all of the Assignor's right. title and interest in the equipment. which is the subject of the EFA and is described in Schedule "A" of the EFA (the "Equipment").

57.     The PSA would also make reference to the appliable Guaranty referred to above as providing "further rights granted as security" to Plaintiff.

58.     The references to security and to the Guaranty made in the PSA along with other representations made by the Debtor both orally and in writing gave Plaintiff the false impression that the loans or investments made from the IRA were fully secured by discreet EFAs not assigned to anyone else and induced Plaintiff to allow monies held in the IRA to be loaned or re-loaned with CFS time and time again.

59.     In 2008, the designated representative for Plaintiff with respect to the IRA held at PENSCO was changed from David R. Stone to Ms. Dawn Stanley, another officer of CFS, pursuant to an "Account Authorization Access" form (the "2008 Authorization Form") executed as of June 27, 2008 by Plaintiff and Dawn Stanley of CFS.  According to the 2008 Authorization Form, the designated representative "will have full authority to access the Account information and give PENSCO Trust Company investment and transaction instructions for the Account." A true and correct copy of the 2008 Authorization Form (with redactions for privacy purposes) is attached hereto as **Exhibit 11** (page 63) and is incorporated herein by this reference.

60.     Plaintiff is informed and believes and on that basis alleges that PENSCO officially became Pacific Premier Trust on June 1, 2020, when it was merged with and into Pacific Premier Bank.  After that point, Plaintiff's IRA was held at Pacific Premier Trust ("Pacific Premier").  Also after this point, each PSA named Pacific Premier Trust Custodian FBO Janet Simkins IRA as the "Assignee" under the applicable PSA.  Ms. Dawn Stanley, an officer of CFS, or the Debtor remained an "Authorized Representative" for the IRA now held at Pacific Premier.

61.     On various occasions, the PSAs evidencing withdrawals from the IRA to "invest" the funds with CFS, were signed not by Plaintiff, but rather by David Stone or, after 2008, by Ms. Dawn Stanley of CFS.

COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT

CASE NO. 24-BK-15641-WJ

62.    One of the more recent PSAs that was executed in connection with a withdrawal from the IRA is a "Participation and Security Agreement" executed as of April 15, 2024 (the "Axume PSA") by the Debtor as "Assignor" and by Plaintiff reciting that CFS assigned transferred and set over to "Pacific Premier Trust Custodian FBO Janet Simkins IRA" as "Assignee" rental payments due under an Equipment Lease Agreement between CFS and an individual trucker named Abel A. Ramos Axume.  A true and correct copy of that PSA is attached hereto as **Exhibit 12** (page 65) and is incorporated herein by this reference.  In this circumstance, the interest rate promised to Plaintiff was ten percent (10%).  Once again, the Axume PSA purported to grant Plaintiff "a security interest in and a lien on all of the Assignor's right, title and interest in the equipment, which is the subject of the ELA and is described in Schedule "A" of the ELA (the "Equipment")."

63.    The Axume PSA also stated that Plaintiff had "further rights granted as security more fully explained in that certain Guarantee Agreement between Assignor and Assignee entered into on April 28, 1998" although this may have been a pasting error and the intent was to refer to a later Guaranty.

64.    The Axume PSA further represented to Plaintiff that "Assignor has the right to assign the ELA, and this Agreement conveys good title to the Participation free of all liens and encumbrances."

65.    All PSAs used by the Debtor as part of his fraudulent "business model" with respect to CFS contained substantially similar terms, recitations and representations to those contained in the Axume PSA.

66.    Each of the recitations and representations made by the Debtor in the Axume PSA and each other PSA used on behalf of CFS relating to Plaintiff's secured positions or ability to rely on a Guaranty were false and the Debtor knew them to be false when he made those recitations and representations.  In addition, the text of each PSA and the recitations and representations contained in them were designed and intended to induce an unwary potential "investor" such as Plaintiff into

16

believing that she was secured and protected and not undertaking any significant risk by using funds in in her IRA to purchase PSAs from CFS.  This design and intent was fraudulent, deceitful, malicious and willful.

67.     In early July, 2025, Plaintiff received a statement from Pacific Premier Trust (the "PPT Statement") covering the period spanning April 1, 2025 through June 30, 2025, a true and correct copy of which (redacted to remove personal information) is attached hereto as **Exhibit 13** (page 67) and is incorporated herein by this reference.  According to the PPT Statement, Plaintiff's IRA account had a value on April 1, 2025 of $550,986.11.  Out of that sum, $542,201.98 was represented by "investments" with CFS in seven (7) PSAs identified by the names of different lessees.

### Bankruptcy.

68.     On April 14, 2025, the Debtor commenced his chapter 7 case.

69.     On Schedule D of his Schedules, the Debtor scheduled creditors holding secured claims and listed among them some 75 creditors (the "EFA Creditors") holding claims aggregating some $55,142,794 (according to Schedule D) which are reportedly (according to Schedule D) secured by $12,692,311.60 in the form of a collateral pool described in Schedule D as "Balance owing to Debtor in leased trucks."

70.     The Debtor committed fraud upon Plaintiff by leading her to believe that each loan she made to CFS and each PSA representing a purchase from her IRA were secured by specific identifiable truck leases.  If that were the case, the collateral pool securing her claims would be identifiable and close in value to the amounts she loaned to CFS plus the amounts used from her IRA to purchase interests in PFAs.  Furthermore, the total collateral pool for all EFA Creditors should not be worth some $40 million *less* that the amount scheduled as being owed to the EFA Creditors.

71.     In addition to the EFA Creditors which are owed (based on Schedule D) some $55,142,794, the Debtor has scheduled unsecured claims totaling

17

1  $6,890,243.37, but that figure does not include potential claims of unsecured

2  creditors with respect to which Schedule E/F listed their claim amounts as

3  "unknown."

4      72.    According to the PPT Statement attached hereto as **<u>Exhibit 13</u>** (page

5  67), the interests of Plaintiff in the truck leases that were subject to PSAs executed

6  by CFS in connection with the IRA are now considered to be zero.

7      73.    In light of the information currently available from the Debtor's

8  Schedules and the PPT Statement, there is a substantial likelihood that Plaintiff will

9  recover mere pennies on the dollar, if anything, on account of her claims against the

10  Debtor—claims that the Debtor deceitfully led her to believe were fully secured.

11     74.    The damages suffered by Plaintiff which are non-dischargeable total not

12  less than $1,192,201.98 ***plus*** interest as allowed by law, attorneys' fees and costs as

13  allowed by law, punitive damages, and other such relief as the Court deems proper.

## <u>FIRST CLAIM FOR RELIEF</u>

### **(Fraud 11 U.S.C. § 523(a)(2)(a))**

16     75.    Plaintiff incorporates by reference each and every allegation contained

17  in all Paragraphs of this Complaint as though fully set forth.

18     76.    Pursuant to 11 U.S.C. § 523(a)(2)(A), a discharge under section 727 or

19  section 1328 of Title 11 of the United States Code does not discharge a debtor for

20  money obtained by false pretenses, a false representation, or actual fraud.

21     77.    Where a debtor is guilty of "making affirmative misrepresentations of

22  fact, omitting disclosure of pertinent facts which he had a duty to disclose, and creating

23  a false pretense of a low risk, high return investment program [thereby causing

24  Plaintiff] to part with her money because of his fraud," the debtor's debt "is

25  nondischargeable under § 523(a)(2)(A)." *In re Del Valle*, 577 B.R. 789, 794 (Bankr.

26  CD Cal. 2017).

27     78.    The Debtor on his own behalf and as a principal of CFS made false

28  representations through documents such as the Prospectus delivered to Plaintiff and

COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT

CASE NO. 24-BK-15641-WJ

her husband, newsletters distributed annually, marketing materials and many other written communications representing to potential "investors" that either they were purchasing specific Equipment Financing Agreements (that is, "EFAs"), or that specific EFAs fully secured their loans.  The Debtor's statements and failure to disclose that EFAs specifically identified to loan made by Plaintiff to CFS also were identified to other loans created "a false pretense of a low risk, high return investment" that caused Plaintiff to part with over $1,000,000, approximately half of which came from her retirement account.

79.    The Notes issued by CFS explicitly stated that each note was secured by specific EFAs.

80.    The Debtor misrepresented to Plaintiff that not only was she fully secured by the EFAs, but that the Guaranty provided additional security to her, claims that the Debtor knew were false.

81.    The Debtor deceitfully and fraudulently represented to Plaintiff and her husband that CFS had sufficient liquidity to repay loans made to CFS at maturity.

82.    The Debtor deceitfully and fraudulently represented to Plaintiff and her husband that specific EFAs were either sold to Plaintiff and her husband or were allocated to Plaintiff and her husband in each case to the exclusion of other competing "investors" or lenders.  This was a false representation and the Debtor knew it was false when he made those representations.

83.     Plaintiff is informed and believes and thereon alleges that neither the Debtor nor CFS had the capacity, resources, or means to repay loans at maturity if investors failed to roll loans over or if the Debtor failed to entice new "investors" to participate in the Debtor's schemes.

84.    Plaintiff is informed and believes and thereon alleges that at all times mentioned herein, the Debtor knew his representations were false or recklessly disregarded the truth of his representations when he made them.

COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT

CASE NO. 24-BK-15641-WJ

85.     Plaintiff reasonably and justifiably relied on the fraud, misrepresentations and falsehoods communicated to her orally and in writing by the Debtor to Plaintiff's harm, injury and detriment suffering actual damages totaling in excess of $1,192,201.98, plus interest and attorneys' fees and costs as allowed by law.

86.     Based on the foregoing, the Debtor committed actual fraud within the meaning of ii U.S.C. §523(a)(2)(A) and as a result of the actual fraud, Plaintiff is entitled to receive a Judgment from this Court: (i) for monetary damages in the amount of not less than $1,192,201.98  plus interest, fees and costs as permitted by law; and (ii) that said Judgment should be adjudged, decreed and determined by this Court to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

### SECOND CLAIM FOR RELIEF

### (Larceny 11 U.S.C. §523(a)(4))

87.     Plaintiff incorporates by reference each and every allegation contained in all Paragraphs of this Complaint as though fully set forth.

88.     Pursuant to 11 U.S.C. § 523(a)(4), a discharge under section 727 or section 1328 of Title 11 of the United States Code does not discharge a debtor for money obtained by larceny.

89.      The Debtor took possession of not less than $1,192,201.98, which was the property of Plaintiff. The funds were provided by Plaintiff under and pursuant to false pretenses, fraud and a design by the Debtor to steal the funds from Plaintiff for the Debtor's personal use rather using the funds to acquire sufficient EFAs to fully secure the loans or "investments" made by Plaintiff to the Debtor (or to his alter ego, CFS).

90.     The Debtor induced Plaintiff and her husband to provide funds to the Debtor willingly through the false pretenses of the Debtor. The funds were intended to be loaned to CFS in order to enable CFS to enter into legitimate EFAs that were then either sold to Plaintiff or duly pledged to Plaintiff to fully secure the loans she

made to CFS.  Instead, the Debtor's true purpose was to unjustly enrich himself while deliberately failing to uphold his agreed-upon obligations.

91.    Plaintiff is informed and believes and thereon alleges that at the time the Debtor took possession of the funds from Plaintiff, he intended to permanently deprive Plaintiff of the money through deceit and trickery. Evidence of such includes the Debtor's practice of enticing Plaintiff to "roll" notes over rather than paying them off at maturity, enticing her to make loans or "investments" by assuring her of her fully secured status and providing attractive returns without protecting Plaintiff's principal, and enticing her to make an additional loan at a higher rate of interest when other lenders were demanding the repayment of their principal.

92.    As a result of the Debtor's actions, Plaintiff was deceitfully deprived of her money. The misappropriation and actual larceny of the funds by the Debtor has persisted for years.

93.    Plaintiff reasonably and justifiably relied on the fraudulent statements, misrepresentations and falsehoods communicated to her orally and in writing by the Debtor to Plaintiff's harm, injury and detriment suffering actual damages from the larceny committed by the Debtor totaling not less than $1,192,201.98 plus interest and attorneys' fees and costs as allowed by law.

94.    Rather than be forced to return Plaintiff's money, the Debtor filed a chapter 7 petition and is thereby refusing to repay Plaintiff.

95.    Based on the foregoing, the Debtor has committed larceny within the meaning of 11 U.S.C § 523(a)(4) and as a result of the larceny, Plaintiff is entitled to receive a Judgment from this Court: (i) for monetary damages in the amount of not less than $1,192,201.98, plus, interest, fees and costs as permitted by law; and (ii) that said Judgment should be adjudged, decreed and determined by this Court to be nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT

CASE NO. 24-BK-15641-WJ

## THIRD CLAIM FOR RELIEF

### (Willful and Malicious Injury 11 U.S.C. § 523(a)(6))

96.    Plaintiff incorporates by reference each and every allegation contained in all Paragraphs of this Complaint as though fully set forth.

97.    Pursuant to 11 U.S.C. § 523(a)(6), a discharge under section 727 or section 1328 of Title 11 of the United States Code does not discharge a debtor for any debt for willful or malicious injury by the debtor to another entity or to the property of another entity.

98.    Plaintiff was at all times since 2007 over 65 years of age and was therefore an "Elder" within the meaning of California Welfare and Institutions Code ("Welf & Inst. Code") §15610.27 for all events described above occurring after Plaintiff's 65th birthday in 2007.

99.    Under Welf & Inst. Code §15610.30(a):

"Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:

(1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use *or with intent to defraud*, or both.

(2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use *or with intent to defraud*, or both.

(3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by *undue influence*, as defined in Section 15610.70.

(Emphasis added.)

100.    Under Welf & Inst. Code §15610.70(a):

"Undue influence" means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity. In determining whether a result was produced by undue influence, all of the

following shall be considered:

(1) The vulnerability of the victim. Evidence of vulnerability may include, but is not limited to, incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability.

(2) The influencer's apparent authority. Evidence of apparent authority may include, but is not limited to, status as a fiduciary, family member, care provider, health care professional, legal professional, spiritual adviser, expert, or other qualification.

(3) The actions or tactics used by the influencer. . . . .

101.  As is demonstrated by the facts alleged in the preceding paragraphs of this Complaint, the Debtor willfully and maliciously devised an elaborate program designed to enable himself cloaked as "Cornerstone Financial Services" to take or assist in the taking of property in the form of cash and retirement savings from Plaintiff for his own wrongful use and/or with the intent to defraud Plaintiff out of funds that she could sorely afford to lose.

102.  The Defendant manipulated Plaintiff with marketing materials and newsletters and personal appeals extolling the opportunity for significant returns while leading Plaintiff to believe her loans to CFS were fully secured and essentially risk free.  The Debtor heralded that CFS had never defaulted in tis obligations to "investors." but if that was true, it was either because he convinced the creditors he described as "investors" to roll over their notes when they matured, or he enticed new unwitting individuals to participate in his "Ponzi" scheme:  new money came in to keep the Debtor from defaulting with respect to earlier investors.

103.  The Debtor's intent in promoting his scheme and enticing Plaintiff to make loans to CFS, roll loans over as they matured rather than ask the Debtor to pay

COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT

CASE NO. 24-BK-15641-WJ

1  them off, and to drain her IRA for the purpose of buying sham investments from

2  CFS were all done with the intent to defraud Plaintiff.

3      104.  The Debtor also exerted undue influence over Plaintiff.  He knew she

4  was a widow.  He claimed to have a business model proven to succeed over decades

5  that was far superior to investment vehicles offered by banks or other competitors of

6  his.  He held himself out as an expert and unduly influenced Plaintiff to keep most of

7  her capital "invested" with CFS.

8      105.  The Debtor's conduct was reckless, oppressive, and fraudulent.  It was

9  also malicious and willful within the meaning of. 11 U.S.C. §523(a)(6).

10      106.  The Debtor is guilty of financial elder abuse.  As a result, under Welf &

11  Inst. Code §15657.5(a), Plaintiff is entitled to "compensatory damages and all other

12  remedies otherwise provided by law" and in addition "the court **shall** award to the

13  plaintiff reasonable attorney's fees and costs." (Emphasis added.)

14      107.  Plaintiff also seeks punitive damages under California Civil Code §3294

15  in the amount of at least $500,000 against the Debtor and asks that they be trebled

16  based on California Civil Code §3345 which permits the court to treble punitive

17  damages where, among other things, the court considers "(1) Whether the defendant

18  knew or should have known that their conduct was directed to one or more senior

19  citizens, disabled persons, or veterans, " or "(2) Whether the defendant's conduct

20  caused one or more senior citizens, disabled persons, or veterans to suffer . . .

21  substantial loss of property set aside for retirement, . . . ."

22      108.  Based on the foregoing, the Debtor has committed willful or malicious

23  injury with respect to Plaintiff within the meaning of 11 U.S.C. § 523(a)(6) and is

24  also guilty of elder financial abuse within the meaning of Welf & Inst. Code

25  §15610.30(a).  As a result, Plaintiff is entitled to receive a Judgment from this Court:

26  (i) for monetary damages in the amount of not less than $1,192,201.98, plus, interest,

27  fees and costs as permitted by law; , (ii) punitive damages, (iv) attorneys' fees

28  according to proof, and (v) a determination that said Judgment should be adjudged,

24

1  decreed and determined by this Court to be nondischargeable pursuant to 11 U.S.C.

2  §523(a)(6).

3  ## **PRAYER**

4      WHEREFORE, Plaintiff respectfully requests the following relief:

5      1.    For compensatory damages in favor of Plaintiff in the amount of at

6  least $1,192,201.98;

7      2.    For exemplary damages totaling such amount as may be proper;

8      3.    For interest according to proof as allowed by law;

9      4.    For fees and costs incurred by Plaintiff in connection with this action,

10  including reasonable attorneys' fees as allowed by law;

11      5.    For a determination that the debt owed to Plaintiff by the Debtor is

12  nondischargeable under 11 U.S.C. § 523(a)(2)(A) for fraud;

13      6.    For a determination that the debt owed to Plaintiff by the Debtor is

14  nondischargeable under 11 U.S.C. § 523(a)(4) for larceny;

15      7.    For a determination that the debt owed to Plaintiff by the Debtor is

16  nondischargeable under 11 U.S.C. § 523(a)(6) as being willful or malicious; and

17      8.    For such other and further relief as this Court may deem proper.

18

19      DATED: July 21, 2025        PROCOPIO, CORY, HARGREAVES &
                SAVITCH LLP

20

21                  By: _/s/ William A. Smelko_

22                  William A. Smelko
                Attorney for Creditor & Plaintiff, Phil
                Plaintiff

23

24

25

26

27

28

# EXHIBIT 1
# CFS Prospectus



*"CFS" has prepared the following Prospectus for:*

*Ron Simkins*

*Presented by: David R. Stone*

## INTRODUCTION

Cornerstone Financial Services ("CFS") has been a commercial Lender for 20 plus years. The company operates exclusively from our San Rafael, California location. We conduct business on a national scale with some international activity. CFS has a customer base of over 2,500 accounts. Besides our larger ticket, premium accounts, CFS continues one of our most successful lending concepts of "spread-the-risk" small ticket lending (under $50,000) to "B" and "C" credits on basically over collateralized higher rate, short term products. CFS has continued this concept for years, approving credits, perfecting documentation and selling this type of commercial paper through discounting to the financial industry or secondary market and Present Value purchase to the private marketplace.

Over the years, CFS has sold to companies such as Wells Fargo Leasing, Security Pacific Leasing, Chrysler Capital Corporation, Bank of the West, Chase Manhattan, ITT, CIT, Textron Financial Corporation and many others. Most of those financial groups have either merged, been sold outright or have been forced to discontinue discounting purchase paper because of tightening regulatory procedure changes. There has been an ever present revolving door loss of banking relationships because of this volatility.

With the chaos of the financial banking industry, compounded by the S & L deregulation problem, the remaining solvent financial institutions must carry large capital reserves for most forms of consumer and commercial lending. Lenders, for instance, to counter a tight lending environment can invest in Federal Government T-Bills and work on predictable spreads without reserve allocations.

CFS has for many years sold a portion of its small paper products to Private Investors. Investors can participate in our collateral intensive, security enhanced commercial paper as an addition to their portfolio and experience secure equity investing, fully amortized, with yields    consistently at 14% and even higher through compounding.

I

LESSOR/COMMERCIAL LENDER

CFS is a privately held company.  The company's primary focus is to take advantage of the higher yields and shorter amortizations synonymous with commercial lending.  Additional features were the repeat customer base, tax advantages, syndication abilities, Vendor service network and industry and private placement relationships.

CFS is currently rated 2A1 by Dun & Bradstreet.  We maintain a Commercial Lenders License with State Board of Corporations.  Our asset base is made up of real property, commercial paper as a long term receivable, cash and cash equivalents and a residual bank as a future value receivable.  We own our own building in central San Rafael. Our furniture, fixtures and capital equipment are owned outright.

The business and ownership has spotless credit and high unsecured borrowing power, liquidity, and no recorded historical receivable charge-offs and negligible delinquency.

II

PRODUCT

CFS specializes in simple secure commercial Finance Agreements. The Agreements are usually short term (one to three years), non-cancelable contracts. Transaction sizes range from $5,000 to $50,000.

CFS collects initial income from the Debtor on the completed transaction in the form of advance payment rentals, traditionally the first and last payments or roughly 4% to 8% of the financed amount.

CFS retains a 10% guaranteed future purchase Addendum by all Debtor's to purchase the equipment at contract termination. This becomes due after receipt off all contract payments per the Agreement. CFS, as Creditor, has all legal rights (see documentation) as owner of the collateral or sometimes referred to as personal property or equipment. The guaranteed future purchase requirement gives CFS a great incentive to see the commercial paper through maturity.

CFS will assign the remaining payments and all its security to the Private Investor through an Present Value Purchase Agreement (contract) (easy to read, two pages in length). The Agreement is a present value of the remaining payment stream (similar to purchasing a discounted second deed of trust).

Each of the Agreements is different, yet the Private Investor is still receiving a pure predetermined fixed yield based on dollars invested.

The Investor is not charged any points and there are no service fees of any kind. This is a straight purchase paper or participation investment on fully amortized, short term finance Agreements. The Investor begins to realize yield on day one of the investment with normal amortized payments, received monthly. The payments are generally pre-determined, equal in size and the rate is fixed. The interest income received is earned on an annual basis and a 1099 interest income statement is issued after each calendar year, unless the purchase is through your qualified retirement plan or a professional Corporation.

III

CREDIT/BORROWERS

"A" credits in our lending environment (the secondary market) are impractical relative to this product basically because the funds are available to them through their historical banking relationships at very low interest rates.  Additionally, they usually require five year or longer terms. These factors are not appealing to the private market, along with the fact that there is not enough yield to make it worthwhile to service debt that long.

We as Lender/Underwriters are looking for the best credits, highest yield opportunity or rate/risk ratio and the shortest period of time.  We can afford to be selective in a non-lending environment, regardless where the prime rate is.  Our objective is lending to small commercial accounts with guarantee's from the major shareholders, for a short period of time.  Consumer lending is of no interest.  Low interest rates and long amortizations (more than 4 years) are also of no interest.

In a small paper lending environment, rates and terms become less significant with speed, service and future availability of funds become more important.  For every ten deals that we propose, an average of three deals are accepted relative to rates, terms and structure suitable to be offered to Private Investors.

In addition, our understanding of the equipment, personal property and in some cases Real Property being presented as collateral in each Agreement is very important when considering potential liquidation.  In most cases we have additional free and clear collateral, blanket liens, contract assignment, etc., full insurance coverage against fire and theft (in all cases), and qualified full or partial recourse by the Vendors or Sellers of the equipment, along with remarketing agreements.  In some cases, full Lender recourse is available.  In all cases the majority shareholders guarantee the performance of the Commercial Borrowers.

IV

SECURITY

Each Agreement that is prepared by our firm is secured with as much documentation as possible, considering the relatively small dollar amounts. CFS actually losses good business from time to time because we are documentation intensive. Our Documentation includes, but is not limited to:

1.   Finance Agreement
2.   Corporate Resolution (when applicable)
3.   Partnership Resolution (when applicable)
4.   Personal Guarantees of all major shareholders/general partners (all cases)
5.   Acknowledgment of Delivery and Acceptance
6.   Disclaimer (No Warranties by Lessor)
7.   Landlord Waiver (when applicable)
8.   Lien Search (when applicable)
9.   Original Vendor Invoice(s), Collateral Verification
10.  UCC-1 Timely Filing ("Blanket lien on all other equipment and business assets in most cases )
11.  Schedule "A" of all Collateral
12.  Insurance Binder, in most cases for the sum of the payments, with CFS as Loss Payee and Additional Insured
13.  Certificate of title on licensed Vehicles

CFS warrants that the various Agreements are genuine and represent a valid obligation of a bona fide Debtor, all names, addresses, amounts, dates, signatures and other statements and facts are true and correct; the collateral has been delivered and installed, as applicable, and accepted by the Debtor; the Agreement and any guaranty in connection are enforceable in accordance with their terms. The Debtor evidences valid reservation of title to all pledged collateral. The Agreement complies in all respects with applicable laws and regulations and is and will be free from any liens, setoffs, counterclaims and other defense. CFS has the right to assign the Agreement and convey good title to the Investor free of all liens and encumbrances.

V

## UNDERWRITING

As credit investigators, we research each potential area of concern and present the information to potential Investors for their review. In all cases the credit package becomes part of the Investor's documentation in the event of a Present Value Purchase Investment which can include some or all of the following:

| | |
|---|---|
| 1. Business History | 12. Agreement signed as to Terms and Rates |
| 2. Bank History | 13. Collateral Evaluation |
| 3. Trade History | 14. Peripheral Recourse Potential |
| 4. Prior Borrowing History (Pay Habits) | 15. Collateral Liquidity (in the event of default) |
| 5. Lien Search | |
| 6. Personal Credit Bureau reports, D&B Business Reports | 16. Landlord history and Waiver of Rights to our Collateral |
| 7. Cash Flow Analysis | 17. Blanket Lien Releases (where applicable) |
| 8. Secondary Support Evaluations | |
| 9. Liquidity Test | 18. Adverse Material explanation or story to Lender Satisfaction |
| 10. Financial Analysis Ratios | |
| 11. Collection of all Financial Information required by Underwriting | 19. Proformas and Projections |
| | 20. Vendor Evaluation, Equipment Support |

## SERVICES/OPERATIONS

Our company is well trained in the areas of credit investigation, underwriting, documentation, billing and collecting, legal and liquidation (if required), and computer tracking, reporting and custom accounting.

Our average annual volume throughout the nineties is over $20 million. Our current capacity is $7.5 million in aggregate debt servicing on small paper (in house). The average Investor purchase is $29,000 per transaction. Current Private activity is over 6 million annually. Historical net chargeoffs to date are none. Investor late payment history, in the aggregate, to date is <u>zero</u>. Current major delinquency (60 days or greater) is negligible.

We have the ability to build custom "deposit only" bank accounts for Investors to keep their monthly principle and interest payments separate from their other assets, along with the ability to compound and reinvest principle and interest by CFS for the highest yield obtainable by this investment. Investors typically invest with CFS with funds from the sale of stocks, savings and money market transfers, family and children trusts and qualified retirement plans.

VI

COLLECTIONS/DEFAULT

CFS as the Creditor maintains all correspondence with the contract Debtor. Debtor's are individually invoiced each month, two weeks prior to the due date. Each Debtor has a monthly due date depending on the transaction activation date. The invoice includes the current payment, late fees (if any), and all applicable taxes.

The Debtor is faxed a reminder if payment is not received by day five. The Debtor receives a phone call on day 10, plus is hit with a late fee (varies between 7% and 10% of the monthly payment). Remember the credits realize at approval (through our presentation) that they are "B" and "C" caliber Borrowers and are forever reminded that their pay back history is paramount to the current deal and any future transactions.

If payment has not been received by day 15, the pressure is stepped up. By the 30th day, CFS contacts the Vendor for remarketing, recourse (if any), collateral condition and current value. With 2,500 clients, CFS begins to contact similar users of the collateral for contract assumption possibilities. Assumption is highly possible because of the established equity in the equipment inherit with the short term amortization's.
Bankruptcies will not impair our ability to collect, as CFS is the owner of the equipment with a perfected security interest that is guaranteed to be first and foremost. A business bankruptcy does not protect the individuals behind the company. Most bankruptcies are for reorganization and not debt discharge. Naturally, over the years, we have been a Creditor named in a bankruptcy. In all but one case we were reaffirmed, in other words our debt was recognized by the court and continued as a necessary and current debt by court requirements based on our security Agreements and the income producing characteristics of the collateral. The other case required the Debtor to forfeit the collateral. The collateral had twice the value of the outstanding debt.

All during this period Investor payments are maintained. Upon a declared default by CFS, the Investor interest is discontinued and the remaining principle balance is identified and the recovery process continues. All activity is documented in writing along with any verbal correspondence.

1.    Collateral recovery is paramount and first.
2.    Collateral is quickly remarketed and proceeds are applied against outstanding principle. Any deficiencies are pursued against the guarantors/secondary sources of recovery.
3.    In the case of recourse, recourse will immediately become due on the deficient account.

VII

RISK

Risk is relevant to other investments or competition. The stock market has ups and downs, rarely predictable. Don't forget the transaction fees and maintenance. A Certificate of Deposit at your local bank seems to be a safe investment. At four to six percent? The entire principle is locked into a full term with a heavy penalty for early liquidation, often equal to all interest earnings. Bank failures are running 300 to 500 institutions on average per year over the past five years. FDIC insurance is broke. It takes months to recover assets trapped in an insolvent financial institution.

How about second mortgages with an eight to ten percent return? The property is the only collateral, no secondary source of recovery. You must service the first mortgage in a default and pay expenses to maintain your position and liquidation is averaging more than a year at prices lower than the original value. Your principle is at risk for the full term. You also must maintain the property. Seconds are now behind larger senior first liens because of the record refinance era of the early 90's.

Our product is usually generated from our repeat customer base. Additionally, business comes from our historical Vendor relationships with recourse and remarketing often included. The additional collateral percentage or structure is higher than "A" commercial paper. Secondary source of recovery is present on every deal. Fire and theft insurance is maintained on every deal. Monthly contact is maintained through the receivable process. CFS recourse is available in some cases depending on the industry and level of financial discovery.

Currently all our Investors come through the referral network. In other words all Investors are connected and knowledgeable of other Investors. We produce annual news letters and other items of interest to reassure all Investors as to the overall security enjoyed by everyone.

CFS's management, free of fees, of the purchased transaction is inherent on every deal. Proceeds can be managed in a custom private bank account. Since principle is received monthly, the aged paper becomes more valuable. Liquidity is always available because aged paper with a reduced term and equity recovery, plus a current pay history becomes easier to sell. Compounding and reinvesting is easy as Agreements return principle and interest to a common account monthly. A simple two-page assignment transfers the security interest to the Investors.

Agreement yields have not been lower than 14% throughout the nineties, with compounding yields over 20%. Portfolio's managed by CFS can double in value in five years. Full credit presentations are done before a purchase is offered or recommended. The yield return versus the potential risks are high when compared to other investments. CFS carries sufficient reserves in the event of a liquidated loss.

VIII

MATERIALS

Upon request we will send you sample documentation of an existing current transactions.

We can send you a credit package on a transaction available for assignment or a sample package on an aged transaction.

We can send you a full financial disclosure on the company and ownership, plus references.

The following reports are included for your benefit with any Present Value Participation.

REPORTS

First is a report outlining normal amortization in a format which reflects the actual yields and separates principle and interest monthly on a declining basis.

As additional transactions are accumulated, we can offer a blended valuation report with a breakdown of monthly and annual cash flows.

We also supply you with an annual accrual, for tax planning and cash flow management all of which are updated with additional acquisitions.

FUTURE

CFS's current philosophy is to maintain its current size. CFS would like to maintain local investor money equal to the anticipated annual roll off, or roughly $4 to $6 million. This Private Investor base allows us to maintain a constant ability to make private money available to our clientele, which allows us to continue to have a first class service and product availability to our new and repeat customer base.

IX

| DEAL | MONTHS BETWEEN PURCHASES | PURCHASE DATE | INITIAL PAYMENT DATE | PRESENT VALUE | PAYMENT (APR 14%) | INTEREST THRU MATURITY | MATURITY DATE |
|---|---|---|---|---|---|---|---|
| 1 | 0 | 09-01-94 | 10-01-94 | $100,000.00 | 3,579.88 | 21,715.92 | 07-01-97 |
| 2 | 6 | 04-01-95 | 05-01-95 | 25,059.00 | 879.09 | 5,441.90 | 02-01-98 |
| 3 | 5 | 10-01-95 | 11-01-95 | 26,862.00 | 961.63 | 5,833.42 | 08-01-98 |
| 4 | 4 | 03-01-96 | 04-01-96 | 27,195.00 | 973.55 | 5,905.70 | 01-01-99 |
| 5 | 3 | 07-01-96 | 08-01-96 | 25,644.00 | 918.10 | 5,571.40 | 05-01-99 |
| 6 | 3 | 11-01-96 | 12-01-96 | 29,320.00 | 1,049.62 | 6,367.08 | 09-01-99 |
| 7 | 3 | 03-01-97 | 04-01-97 | 33,516.00 | 1,199.83 | 7,278.22 | 01-01-00 |
| 8 | 2 | 06-01-97 | 07-01-97 | 28,410.00 | 1,028.86 | 6,241.24 | 04-01-00 |
| 9 | 3 | 10-01-97 | 11-01-97 | 31,696.00 | 1,134.68 | 6,883.12 | 08-01-00 |
| 10 | 3 | 02-01-98 | 03-01-98 | 32,652.00 | 1,168.90 | 7,090.60 | 12-01-00 |
| 11 | 3 | 06-01-98 | 07-01-98 | 33,740.00 | 1,207.85 | 7,326.90 | 04-01-01 |
| 12 | 3 | 10-01-98 | 11-01-98 | 36,648.00 | 1,311.95 | 7,958.30 | 08-01-01 |
| 13 | 3 | 02-01-99 | 03-01-99 | 36,375.00 | 1,302.18 | 7,899.12 | 12-01-01 |
| 14 | 4 | 07-01-99 | 08-01-99 | 36,434.00 | 1,304.29 | 7,911.86 | 05-01-02 |
| 15 | 2 | 11-01-99 | 11-01-99 | 28,451.00 | 1,018.51 | 6,178.34 | 08-01-02 |
| | TOTALS | | | 532,002.00 | 19,039.06 | 115,603.12 | |
| | AVERAGES | | | 35,466 | 1,269.26 | 7,706.89 | 34 Months |

Interest earned per the example is based on the demonstrated purchasing frequency or $90,299 through year ending #5.  The yearly average is $18,060 or a compounded return of 18% against original investment.

Average annual exposure on working original principle is $82,267 versus $18,060 interest earned, equals a yield of 22%.

Average purchase size based on the example is $35,466.

Additional annual average interest of $355 or 2% on $17,733 based on current savings rates, for a 5 year total of $1,775, are not included in valuation assumptions.

| # | YEAR | ANNUAL INTEREST | INTEREST GROWTH |
|---|---|---|---|
| 1 | 1995 | $13,730 | 13.7% |
| 2 | 1996 | $15,853 | 29.6% |
| 3 | 1997 | $18,113 | 47.7% |
| 4 | 1998 | $20,590 | 68.3% |
| 5 | 1999 | $22,013 | 90.3% |
| ROLLOFF | (ASSUMES NO NEW PURCHASES) | | |
| 6 | 2000 | $15,635 | 105.9% |
| 7 | 2001 | $ 5,618 | 111.6% |
| 8 | 2002 | $   634 | 112.2% |

# EXHIBIT 2
# Guaranty dated 4-28-98

# AGREEMENT

## WITNESSETH:

Whereas, <u>Ronald Simkins, as Individual or inclusive in any other denomination</u> hereinafter called "Assignee", and Cornerstone Financial Services and David R. Stone joint, several and collectively responsible, hereinafter called "Assignor" and Assignee enter into an Agreement whereby Assignee purchases from Assignor certain individual, stand alone, Present Value Contracts, further known as Participation and Security Agreements "Contracts" which Assignor offers for sale to the private market place and provides Contracts for purchase after a full review by Assignee at their current market value based on the prevailing rate, and

Whereas, Assignor, as a condition precedent to entering into said Contacts agrees to unconditionally guaranty against a financial setback of any kind by Assignee beyond the receipt monthly of the amortized payment stream or proceeds or monies due and to become due to Assignee from Assignor as manager of the Contracts. Assignee shall not rely solely on the performance of the Debtor's evident in each Contract and the promises and covenants contained therein for a full repayment of the monies due Assignee. Assignor's guarantee will not be limited to but provide additional security in the form of all business assets and personal assets now owned and hereafter acquired as a secondary form of recovery in the event that the primary security in each Contract is not sufficient based on the original terms and conditions to fully discharge the monies due or to become due to Assignee in the aggregate.

Now therefore, Assignor, unconditionally guarantee's and promises to pay to Assignee and to perform, on demand, all of the Obligations, as provided for herein, together with the warrants and representations expressed and implied in the individual Contracts, provided however, that this Agreement is incorporated into and made a part of each qualified Contract. Incorporation will reference in each qualified Contract this executed Agreement by name and date of entry . This Agreement shall not apply to any obligation arising under any Contract purchased by Assignee whereby this Agreement has not been incorporated in and made apart thereof. For purposes of this Agreement the term "Obligations" is used in its most comprehensive sense and includes each and every payment or other Obligation of the Contract. The term includes voluntary and involuntary Obligations, however arising, whether the Assignor is liable professionally or individually or jointly with others, whether enforcement against Assignor may be barred by a statute of limitations or whether such Obligations may be enforceable against Assignor for any other reason.

The liabilities of Assignor hereunder are joint and several and separate and independent of the Obligations of the various Contracts, and a separate action may be brought against Assignor and Assignor waives the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.

Assignor waives any defense by reason of any disability or other defense of Assignor or by reason of the cessation from any cause whatsoever of the liability of the Assignor. Until all Obligations shall have been paid and performed in full, Assignor shall have no right of subrogation and waives any right to enforce any remedy which Assignee now has or may hereafter have against Assignor and further any rights, title or interest in any Contract and any benefit of, and any right to participate in, any security now or hereafter held by Assignee for the Obligations. Assignee may foreclose in any manner allowed by law, any asset of Assignor, however implied, securing any of the Obligations, and Assignor shall cont nue to remain liable for all Obligations notwithstanding that such foreclosure may not discharge fully the Obligation due Assignee or diminish Assignee's rights against Assignor. Assignor waives all presentments, demands and performance, notices of non performance, protests, notices of protests, notices of dishonor, notices of acceptance of any other notices as to this Guaranty of the Obligations.

In addition to all liens upon, and rights of setoff against, the monies, securities or to the assets of Assignor given to Assignee by law, Assignee shall have a lien upon and a right to setoff against all monies, securities and other property of Assignor now or hereafter in the possession of or on deposit with Assignee, whether held in a general or special account or deposit, or for safekeeping or otherwise, and every such lien and right to setoff may be exercised without demand upon or notice to Assignor. No lien, right of setoff or other right or remedy in connection with this Agreement shall be deemed to have been waived by any act or conduct on the part of the Assignee or by any neglect to exercise such right of setoff or other right or remedy under this Agreement shall continue in full force and effect until such right of setoff, lien or other right or remedy is specifically waived or released by an instrument in writing executed by Assignee.

Assignor agrees to pay reasonable attorneys' fees and all other costs and expenses which may be incurred by Assignee n the enforcement of this Agreement.

ιny notice to be given in connection herewith by either party to the other may be effected by personal delivery in writing or by registered or certified mail, United States mail postage prepaid, return receipt requested, and shall be deemed communicated as of mailing. Mailed notices shall be addressed as set forth below, but each party may change its address by written notice in accordance with this paragraph.

This Agreement shall be governed by California law. Venue for any action related to this Agreement shall be in an appropriate court in the appropriate County of California selected by Assignee to which Assignor hereby consents or in another court having jurisdiction over the parties selected by Assignee.

This Agreement , when entered into, shall have a retroactive effect so as to joint and severally include and cover all prior, current and future executed Contracts, now in full force and effect or to become in full force and effect, as to wholly and fully bind said Contracts with the promises, terms, conditions and covenants expressed herein.

**ASSIGNOR ACKNOWLEDGE THAT VARIOUS LEGAL RIGHTS ASSIGNOR MIGHT OTHERWISE HAVE ARE WAIVED UNDER THIS AGREEMENT. ASSIGNOR HAS READ THIS AGREEMENT AND WARRANTS THAT SUCH WAIVERS AND THEIR IMPLICATIONS ARE UNDERSTOOD.**

**In witness thereof the undersigned Assignor's have executed this Agreement this** $28th$ **day of** _APRIL_ 19 _98_.

ASSIGNOR:
Cornerstone Financial Services, Principal

_David R. Stone_
David R. Stone, Principal

ASSIGNOR:
David R. Stone, Individual

_David R. Stone_
David R. Stone, Individual

# EXHIBIT 3
# 1996 Agreement

## AGREEMENT

On __MAY 14, 1996__ Cornerstone Financial Services (CFS) enters into the following AGREEMNET with __Harry & Janet Simkins__ (INVESTOR). This agreement shall encompass current proceeds received, any and all future proceeds advanced by Investor, proceeds of proceeds plus interest accrued (Proceeds). CFS shall maintain all Proceeds in a CFS holding account (Account) for the benefit of the Investor. Proceeds shall accrue and become due on maturity which is demand.

CFS has agreed to hold Investor's Proceeds in a fashion which readily avails the Proceeds for the Investor upon demand or for present value purchase investment opportunities which are offered by CFS. All Proceeds in receipt shall bear interest at the rate of 5% (five-percent) annual simple interest, accredited on the basis of a daily equivalent, adjusted quarterly relative to principle balance. Should Investor request a return of any percentage of Proceeds from the Account then CFS shall accommodate such request with the return by a CFS check, the Proceeds within seven (7) calendar days. Investor may make two (2) such request per calendar year other than present value purchases.

Read, signed and agreed;

DATED: __5-14-96__        __Cornerstone Financial Services__

BY: _____
David R. Stone
TITLE: __Principal__

DATED: __5/14/96__        INVESTOR: __Harry & Janet Simkins__

BY: _____

BY: _____

# EXHIBIT 4
# 1997 Check for $100K

1012

HARRY R SIMKINS ET AL TTEE
THE SIMKINS FAMILY TRUST
U/A 03/26/97

FIDELITY CASH RESERVES

DATE 1/22/ 97

80-568/1012

PAY TO THE ORDER OF  Cornerstone Financial   | $ 100,000 00/100

One Hundred Thousand and no/100 — DOLLARS

Fidelity Investments
UNITED MISSOURI BANK
WARSAW, MO.

FOR_____

Harry Ronald Simkins

1:10120568 1::010102::

© HARLAND 1997

Received 1-22-98 by
Dawn Stacy - Cornerstone Financial

DStacy

# EXHIBIT 5
# $250,000 Note, with
# EFA list and 3 checks

DO NOT DESTROY THIS NOTE: When paid, this note with Equipment Finance Agreements Schedule
"A" attached, securing same, must be surrendered to Beneficiary upon maturity.

NOTE SECURED BY EFA Schedule "A" attached.
10% (Ten Percent) Annual Interest Only, Paid Quarterly

$250,000                          San Rafael, California                          July 15, 2006

FOR VALUE RECEIVED and in accordance with the terms and conditions as stated herein, the
undersigned, David R. Stone, d.b.a. Cornerstone Financial Services (CFS) promises to pay to Simkins
Family Trust (Beneficiary), simple annual interest only, paid quarterly, at the annual rate of ten (10%)
percent with all principle due on maturity. Sum Principle shall become due and payable three (3) years
from Note inception, unless mutually renewed. Inception shall be the date incorporated herein.

This NOTE is further secured with the attachment Schedule "B" of that certain previous note (Guaranty
Agreement) entered into on or about April 28, 1998 and re-executed with the date herein and all of its
continuing guarantee's written, expressed or implied. The Schedule "A" attachment shall represent a
present value of multiple transactions equal to $250,000 or greater on the date of inception. All
transactions attached shall contain monthly level payment amortizations payable to and received by CFS.

CFS, at their discretion only, shall adjust quarterly the Schedule "A" attachment with supplemental
additional transactions to maintain a present value security of not less than $250,000 through maturity.
CFS shall exercise care that all attached transaction shall contain a level of quality experienced by
Beneficiary based on historical representations to date. Beneficiary shall receive a comprehensive
Schedule "A" of transactions attached upon inception and at any future point upon request through
maturity.

THIS NOTE PAYS INTEREST ONLY, QUARTERLY, IN THE AMOUNT OF $6,250. ANNUAL
ACCUMILTIVE PAYMENTS RECEIVED SHALL EQUAL $25,000 (TWENTY FIVE THOUSAND)
BASED ON TEN PERCENT (10%) ANNUALIZED INTEREST THROUGH MATURITY.
MATURITY IS JULY 15, 2009.

This Note is an integral part of the overall security. Any violation as to the terms and conditions of this
Note is grounds for default by Beneficiary or it's assigns and with all legal remedies available to
Beneficiary. The prevailing party in any action shall be entitled to the recovery of all costs, including
attorney's fees.

_____                          _____
David R. Stone d/b.a.                                         Simkins Family Trust, Beneficiary
Cornerstone Financial Services

**Equipment Finance Agreement Schedule "A" attached to that certain
Note dated July 15, 2006 by David R. Stone d.b.a.
Cornerstone Financial Services and the Simkins Family Trust**

|   | Date | Transaction | Present Value |
|---|------|-------------|---------------|
| 1 | 07-15-2006 | David Mendoza d.b.a. Mendoza Trucking | 50,788.90 |
| 2 | 07-15-2006 | Rajinder Davegun d.b.a. A & J Transport | 68,031.12 |
| 3 | 07-15-2006 | Terrance Martin, Individual | 37,314.15 |
| 4 | 07-15-2006 | Floyd J. Salazar, Individual | 58,728.39 |
| 5 | 07-15-2006 | Jose Luis Vargas d.b.a. JLV Trucking | 40,041.20 |
| Total |  |  | 254,903.76 |

**This Schedule "A" attached, adjusted quarterly through maturity and equal
to not less than $250,000.00 in present value.**



# EXHIBIT 6
# 2006 Guaranty

# GUARANTY
## AGREEMENT

### WITNESSETH:

Whereas, Ronald Simkins, as Individual or inclusive in any other denomination and now known as Simkins Family Trust (originally executed April 28, 1998) hereinafter called "Assignee", and Cornerstone Financial Services and David R. Stone joint, several and collectively responsible, hereinafter called "Assignor" and Assignee enter into an Agreement whereby Assignee purchases from Assignor certain individual, stand alone, Present Value Contracts, further known as Participation and Security Agreements "Contracts" which Assignor offers for sale to the private market place and provides Contracts for purchase after a full review by Assignee at their current market value based on the prevailing rate, and

Whereas, Assignor, as a condition precedent to entering into said Contacts agrees to unconditionally guaranty against a financial setback of any kind by Assignee beyond the receipt monthly of the amortized payment stream or proceeds or monies due and to become due to Assignee from Assignor as manager of the Contracts. Assignee shall not rely solely on the performance of the Debtor's evident in each Contract and the promises and covenants contained therein for a full repayment of the monies due Assignee. Assignor's guarantee will not be limited to but provide additional security in the form of all business assets and personal assets now owned and hereafter acquired as a secondary form of recovery in the event that the primary security in each Contract is not sufficient based on the original terms and conditions to fully discharge the monies due or to become due to Assignee in the aggregate.

Now therefore, Assignor, unconditionally guarantee's and promises to pay to Assignee and to perform, on demand, all of the Obligations, as provided for herein, together with the warrants and representations expressed and implied in the individual Contracts, provided however, that this Agreement is incorporated into and made a part of each qualified Contract. Incorporation will reference in each qualified Contract this executed Agreement by name and date of entry . This Agreement shall not apply to any obligation arising under any Contract purchased by Assignee whereby this Agreement has not been incorporated in and made apart thereof. For purposes of this Agreement the term "Obligations" is used in its most comprehensive sense and includes each and every payment or other Obligation of the Contract. The term includes voluntary and involuntary Obligations, however arising, whether the Assignor is liable professionally or individually or jointly with others, whether enforcement against Assignor may be barred by a statute of limitations or whether such Obligations may be enforceable against Assignor for any other reason.

The liabilities of Assignor hereunder are joint and several and separate and independent of the Obligations of the various Contracts, and a separate action may be brought against Assignor and Assignor waives the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.

Assignor waives any defense by reason of any disability or other defense of Assignor or by reason of the cessation from any cause whatsoever of the liability of the Assignor. Until all Obligations shall have been paid and performed in full, Assignor shall have no right of subrogation and waives any right to enforce any remedy which Assignee now has or may hereafter have against Assignor and further any rights, title or interest in any Contract and any benefit of, and any right to participate in, any security now or hereafter held by Assignee for the Obligations. Assignee may foreclose in any manner allowed by law, any asset of Assignor, however implied, securing any of the Obligations, and Assignor shall continue to remain liable for all Obligations notwithstanding that such foreclosure may not discharge fully the Obligation due Assignee or diminish Assignee's rights against Assignor. Assignor waives all presentments, demands and performance, notices of non performance, protests, notices of protests, notices of dishonor, notices of acceptance of any other notices as to this Guaranty of the Obligations.

In addition to all liens upon, and rights of setoff against, the monies, securities or to the assets of Assignor given to Assignee by law, Assignee shall have a lien upon and a right to setoff against all monies, securities and other property of Assignor now or hereafter in the possession of or on deposit with Assignee, whether held in a general or special account or deposit, or for safekeeping or otherwise, and every such lien and right to setoff may be exercised without demand upon or notice to Assignor. No lien, right of setoff or other right or remedy in connection with this Agreement shall be deemed to have been waived by any act or conduct on the part of the Assignee or by any neglect to exercise such right of setoff or other right or remedy under this Agreement shall continue in full force and effect until such right of setoff, lien or other right or remedy is specifically waived or released by an instrument in writing executed by Assignee.

Assignor agrees to pay reasonable attorneys' fees and all other costs and expenses which may be incurred by Assignee in the enforcement of this Agreement.

Any notice to be given in connection herewith by either party to the other may be effected by personal delivery in writing or by registered or certified mail, United States mail postage prepaid, return receipt requested, and shall be deemed communicated as of mailing. Mailed notices shall be addressed as set forth below, but each party may change its address by written notice in accordance with this paragraph.

This Agreement shall be governed by California law. Venue for any action related to this Agreement shall be in an appropriate court in the appropriate County of California selected by Assignee to which Assignor hereby consents or in another court having jurisdiction over the parties selected by Assignee.

This Agreement , when entered into, shall have a retroactive effect so as to joint and severally include and cover all prior, current and future executed Contracts, now in full force and effect or to become in full force and effect, as to wholly and fully bind said Contracts with the promises, terms, conditions and covenants expressed herein.

**ASSIGNOR ACKNOWLEDGE THAT VARIOUS LEGAL RIGHTS ASSIGNOR MIGHT OTHERWISE HAVE ARE WAIVED UNDER THIS AGREEMENT. ASSIGNOR HAS READ THIS AGREEMENT AND WARRANTS THAT SUCH WAIVERS AND THEIR IMPLICATIONS ARE UNDERSTOOD.**

**In witness thereof the undersigned Assignor's have executed this Agreement this _15_ day of _July, 2006._**

ASSIGNOR:
Cornerstone Financial Services, Principal

David R. Stone/Principal

ASSIGNOR:
David R. Stone, Individual

David R. Stone, Individual

# EXHIBIT 7
# 2008 Note with EFA List
# & $100K check

DO NOT DESTROY THIS NOTE: When paid, this note with Equipment Finance Agreements Schedule "A" attached, securing same, must be surrendered to Beneficiary upon maturity.

NOTE SECURED BY EFA Schedule "A" attached.
10% (Ten Percent) Annual Interest Only, Paid Quarterly

$350,000                        San Rafael, California                        July 1, 2008

This note replaces that original note dated July 15, 2006.

FOR VALUE RECEIVED and in accordance with the terms and conditions as stated herein, the undersigned, David R. Stone, d.b.a. Cornerstone Financial Services (CFS) promises to pay to Simkins Family Trust (Beneficiary), simple annual interest only, paid quarterly, at the annual rate of ten (10%) percent with all principle due on maturity. Sum Principle shall become due and payable one (1) year from Note inception, unless mutually renewed.  Inception shall be the date incorporated herein.

This NOTE is further secured with the attachment Schedule "B" of that certain previous note (Guaranty Agreement) entered into on or about April 28, 1998 and re-executed on July 15, 2006 and all of its continuing guarantee's written, expressed or implied. The Schedule "A" attachment shall represent a present value of multiple transactions equal to $350,000 or greater on the date of inception. All transactions attached shall contain monthly level payment amortizations payable to and received by CFS.

CFS, at their discretion only, shall adjust quarterly the Schedule "A" attachment with supplemental additional transactions to maintain a present value security of not less than $350,000 through maturity. CFS shall exercise care that all attached transaction shall contain a level of quality experienced by Beneficiary based on historical representations to date. Beneficiary shall receive a comprehensive Schedule "A" of transactions attached upon inception and at any future point upon request through maturity.

THIS NOTE PAYS INTEREST ONLY, QUARTERLY, IN THE AMOUNT OF $8,750.00. ANNUAL ACCUMILTIVE PAYMENTS RECEIVED SHALL EQUAL $35,000 (THIRTY FIVE THOUSAND) BASED ON TEN PERCENT (10%) ANNUALIZED INTEREST THROUGH MATURITY. MATURITY IS JULY 1, 2009.

This Note is an integral part of the overall security. Any violation as to the terms and conditions of this Note is grounds for default by Beneficiary or it's assigns and with all legal remedies available to Beneficiary.  The prevailing party in any action shall be entitled to the recovery of all costs, including attorney's fees.

David R. Stone d.b.a.
Cornerstone Financial Services

Simkins Family Trust, Beneficiary

**Equipment Finance Agreement Schedule "A" attached to that certain
Note dated July 1, 2008 by David R. Stone d.b.a.
Cornerstone Financial Services and the Simkins Family Trust**

|    | Date       | Transaction                            | Present Value |
|----|------------|----------------------------------------|---------------|
| 1  | 07-01-2008 | David Mendoza d.b.a. Mendoza Trucking  | 19,098.00     |
| 2  | 07-01-2008 | Rajinder Davegun d.b.a. A & J Transport | 25,581.00    |
| 3  | 07-01-2008 | Terrance Martin, Individual            | 12,405.00     |
| 4  | 07-01-2008 | Floyd J. Salazar, Individual           | 23,256.00     |
| 5  | 07-01-2008 | Jose Luis Vargas d.b.a. JLV Trucking   | 9,093.00      |
| 6  | 07-01-2008 | Gary Wolf, Individual                  | 40,351.00     |
| 7  | 07-01-2008 | Andres Navarro, Individual             | 25,993.00     |
| 8  | 07-01-2008 | Harold McPhetridge, Individual         | 27,166.00     |
| 9  | 07-01-2008 | Gino Hardin, Individual                | 29,443.00     |
| 10 | 07-01-2008 | Domingo Calderon, Individual           | 45,322.00     |
| 11 | 07-01-2008 | Pedro Ayala, Individual                | 44,193.00     |
| 12 | 07-01-2008 | Debra Giles, Individual                | 26,283.00     |
| 13 | 07-01-2008 | Jorge Bruno, Individual                | 38,482.00     |
| **Total** |     |                                        | 366,666.00    |

**This Schedule "A" attached, adjusted quarterly through maturity and equal
to not less than $350,000.00 in present value.**

**JANET H SIMKINS TTEE**
JANET H SIMKINS SURVIVOR'S TR

1003

80-568/1012

Date 6-27-05

Pay to the
Order of ___Cornerstone Financial___    $ 100,000.00

___One Hundred Thousand & no/100_____ Dollars

Fidelity
Investments

United Missouri Bank
Warsaw, Missouri

For _____    Janet H. Simkins

⑈1012 0568 1⑈ 1003⑈

# EXHIBIT 8
# 2021 Note with
# EFA List

DO NOT DESTROY THIS NOTE: When paid, this note with Equipment Finance Agreements Schedule "A"
attached, securing same, must be surrendered to Beneficiary upon maturity.

NOTE SECURED BY EFA Schedule "A" attached.
10% (Ten Percent) Annual Interest Only, Paid Monthly

$350,000                              San Rafael, California                              July 1, 2021

FOR VALUE RECEIVED and in accordance with the terms and conditions as stated herein, the undersigned,
David R. Stone, d.b.a. Cornerstone Financial Services (CFS) promises to pay to Janet Hope Simkins, Trustee, of
the Janet Hope Simkins Survivor's Trust dated December 8, 2003 (Beneficiary), simple annual interest only, paid
monthly, at the annual rate of ten (10) percent with all Principal due on maturity. Sum Principal shall become
due and payable three (3) years from Note inception, unless mutually renewed.  Inception shall be the date
incorporated herein.

This NOTE is further secured with the attachment Schedule "B" of that certain previous note (Guaranty
Agreement) entered into on or about April 28, 1998 and re-executed on July 15, 2006 and all of its continuing
guarantee's written, expressed or implied. The Schedule "A" attachment shall represent a present value of multiple
transactions equal to $350,000 or greater on the date of inception. All transactions attached shall contain monthly
level payment amortizations payable to and received by CFS.

CFS, at their discretion only, shall adjust quarterly the Schedule "A" attachment with supplemental additional
transactions to maintain a present value security of not less than $350,000 through maturity. CFS shall exercise
care that all attached transaction shall contain a level of quality experienced by Beneficiary based on historical
representations to date. Beneficiary shall receive a comprehensive Schedule "A" of transactions attached upon
inception and at any future point upon request through maturity.

THIS NOTE PAYS INTEREST ONLY, MONTHLY, IN THE AMOUNT OF $2,916.67. ANNUAL
ACCUMILTIVE PAYMENTS RECEIVED SHALL EQUAL $35,000 (THIRTY-FIVE THOUSAND) BASED
ON TEN-PERCENT (10%) ANNUALIZED INTEREST THROUGH MATURITY. MATURITY IS JULY 1,
2024.

This Note is an integral part of the overall security.  Any violation as to the terms and conditions of this Note is
grounds for default by Beneficiary or it's assigns and with all legal remedies available to Beneficiary.  The
prevailing party in any action shall be entitled to the recovery of all costs, including attorney's fees.

*David R Stone*
David R Stone (Sep 14, 2021 11:39 PDT)
David R. Stone d.b.a.
Cornerstone Financial Services

*Janet Hope Simkins*
Janet Hope Simkins (Jul 20, 2021 16:12 PDT)
Janet Hope Simkins, Trustee, Janet Hope
Simkins Survivor's Trust dated December 8, 2003

Equipment Finance Agreement Schedule "A" attached to that certain
Note dated July 1, 2021 between David R. Stone d.b.a. Cornerstone Financial Services and the
Janet Hope Simkins Survivor's Trust dated December 8, 2003

|  | DEBTOR NAME | PRESENT VALUE |
|---|---|---|
| 1 | Dayron Rodriguez | 59,063.38 |
| 2 | Luis Robles | 66,949.02 |
| 3 | Corey Dorsett | 40,226.62 |
| 4 | Juan Garcia | 73,594.40 |
| 5 | Clint Jones | 59,760.46 |
| 6 | Luis Oliva Cabrera | 63,006.20 |
| TOTAL | | 362,600.08 |

This Schedule "A" attached, adjusted quarterly through maturity and equal
to not less than $350,000.00 in present value.

# EXHIBIT 9
# 2024 Note
# with EFA List

NOTE SECURED BY EFA Schedule "A" attached.
12% Annual Interest Only, Paid Monthly

$200,000                              San Rafael, California                         November 8, 2024

FOR VALUE RECEIVED and in accordance with the terms and conditions as stated herein, the undersigned, David R. Stone, d.b.a. Cornerstone Financial Services (CFS) promises to pay to Janet Hope Simkins, Trustee, of the Janet Hope Simkins Survivor's Trust dated December 8, 2003 (Beneficiary), simple annual interest only, paid monthly, at the annual rate of twelve (12%) percent with all Principal due on maturity. Sum Principal shall become due and payable three (3) years from Note inception, unless mutually renewed. Inception shall be the date incorporated herein.

This Note is further secured with the attachment Schedule "B" of that certain previous note (Guaranty Agreement) entered into on or about April 28, 1998 and re-executed on July 15, 2006 and all of its continuing guarantee's written, expressed or implied. The Schedule "A" attachment shall represent a sum of the payment value of multiple transactions equal to $200,000 or greater on the date of inception. All transactions attached shall contain monthly level payment amortizations payable to and received by CFS.

CFS, at their discretion only, shall adjust quarterly the Schedule "A" attachment with supplemental additional transactions to maintain a sum of the payments value security of not less than $200,000 through maturity. CFS shall exercise care that all attached transaction shall contain a level of quality experienced by Beneficiary based on historical representations to date. Beneficiary shall receive a comprehensive Schedule "A" of transactions attached upon inception and at any future point upon request through maturity.

THIS NOTE PAYS INTEREST ONLY, MONTHLY, IN THE AMOUNT OF $2,000.00. ANNUAL ACCUMILTIVE PAYMENTS RECEIVED SHALL EQUAL $24,000 (TWENTY-FOUR THOUSAND DOLLARS AND 00/100) BASED ON TWELVE-PERCENT (12%) ANNUALIZED INTEREST THROUGH MATURITY. MATURITY IS NOVEMBER 8, 2027.

This Note is an integral part of the overall security. Any violation as to the terms and conditions of this Note is grounds for default by Beneficiary or it's assigns and with all legal remedies available to Beneficiary. The prevailing party in any action shall be entitled to the recovery of all costs, including attorney's fees.

*David R. Stone*
David R. Stone (Nov 14, 2024 16:14 PST)
David R. Stone d.b.a.
Cornerstone Financial Services

Janet Simkins (Nov 12, 2024 09:07 PST)
Janet Hope Simkins, Trustee, Janet Hope
Simkins Survivor's Trust dated December 8, 2003

By my signature below I authorize CFS to deduct $200,000 from my BNY - Mellon acct ending in ▇▇
on or after November 8, 2024.

Janet Simkins (Nov 12, 2024 09:07 PST)
Janet Hope Simkins

Equipment Finance Agreement Schedule "A" attached to that certain
Note dated November 8, 2024 between David R. Stone d.b.a. Cornerstone Financial Services and the
Janet Hope Simkins Survivor's Trust dated December 8, 2003

| | DEBTOR NAME | PRESENT VALUE |
|---|---|---|
| 1 | Lively, Romero A. and Lively, Cherie B. | 56,020.75 |
| 2 | Jenkins, Darrius L. | 65,444.81 |
| 3 | Rodriguez, Jaime | 63,495.83 |
| 4 | Rodriguez, Victor A. | 50,599.31 |
| | TOTAL | 235,560.70 |

# EXHIBIT 10
# Newsletter - Year End 1995

# CORNERSTONE FINANCIAL SERVICES

*Newsletter*
*Year End 1995*

777 Grand Ave., Ste. 206; San Rafael, CA  94901
415-459-6540 / Fax 459-8215

*As we near another years end we're proud to report again a 100% return, and on time, of all contracted proceeds to all Investor's. We hope your faith in our company to handle your investment dollars for this unique opportunity has met your expectations. Millions in Investor capital was placed in new Agreements in 95' with many Investors coming on board for the first time.*

### F.Y.I.

**Bankruptcy; It's not what it seems . . .**

**A few things about bankruptcy relative to our business and industry.** First of all bankruptcy is a fact of life and is easy for a Debtor to deliberate as an option. Bankruptcy is taken into consideration by CFS during the underwriting process on all transactions. This is why we generally prefer income producing collateral along with required additional collateral. Rarely will a company give up on revenue generating collateral. It is inherit in our marketing concept to pursue revenue producers when structure versus balance sheet lending is considered. As a generally secured Senior Lender with heavy additional collateral of the income producing type we might welcome or initiate bankruptcy.

Most bankruptcy filings by Debtor's are for reorganization. Traditionally Landlord's, Senior and specific Secured Lender's debts are reaffirmed through the, debtor in possession process, according to their original terms and conditions. Real relief to the Debtor comes from the area of unsecured creditors where they are required to take sometimes huge discounts and workouts on their outstanding receivables. All bankruptcies where we have been named as a Secured Creditor to date throughout our history has resulted in the complete recovery of all outstanding proceeds due with very little workout relative to the original terms and conditions. Bankruptcy by the Debtor does not protect the secondary source of repayment, the individuals who own the business inherit on the large majority of our transactions. They would represent a path of recovery for any shortfall.

# Early Payoffs

Some of you may have experienced an early payoff on one of your contracts this past year. Each contract has its own intangibles. When people are involved, changes can occur before the contract reaches normal maturity. Acceptable reasons in the interest of

all parties to allow early payoffs are; the acquisition by another company, replacement of non performing collateral, sale of the collateral under the element of duress, adverse material change such as a pending divorce, breakup of key share holders or contemplated bankruptcy. When duress and adverse change are present the payoff is initiated by us.

### Pensco Pension Services

For those of you who have not yet taken advantage of our relationship with Pensco Pension Services of San Francisco, as a self directed custodian for your IRA, please feel free to contact us for full details.

Essentially, you can invest in CFS products with your IRA capital and experience our high yields, tax free, until retirement disbursement. The transfer entails a small set up fee and then an annual charge of 3/10ths (three-tenths) of one percent of the account equity. This is one of the smallest management fees in the business. Of course our annual management fee of zero dollars remains the leader.

## CFS Holding Accounts

With the prime rate stabilizing at 8.75% in an election year, C.D.'s, Treasuries etc. will continue to offer yields averaging 5 to 6 percent, with tax free investments near 4 percent.

Give our Holding Account a try this year. It preferences purchase equity for the next available investment which best represents the criteria to your existing portfolio. This allows a simultaneous purchase of a new transaction to maximize yield from day one. The Holding Account pays 5% simple interest, credited quarterly, while the equity is idle. During times when Investor demand is greater then the supply, which happened often during 95', the Holding Account is the first source considered for purchase capital

*Feel free to contact us at your leisure to discuss all concepts that can enhance your Investment Account, Trusts of all types or IRA accounts. We can still say after all these years "No losses or late payments to all Investor's, ever!". We expect the same for 96',*

*Have a Safe and Happy Holiday Season ! !*

# EXHIBIT 11
# 2008 Authorization Form

**PENSCO**
**TRUST**
**COMPANY**

Regular Mail  P.O. Box 26903, San Francisco, CA  94126 6903
Overnight 450 Sansome Street, 14th Floor, San Francisco, CA  94111 3306
www.PENSCOTrust.com   T  800 969 4472    F  415 956 3016

Route Code:  **TN10**

# Account Access Authorization

| Terms Defined: | The "IRA Owner" and "Solo(k) Participant" is referred to as: "Account Holder" |
| --- | --- |
| | "IRA" and "Solo(k) Plan" is referred to as: "Account" |

*For more information about the roles of a Designated Representative or Authorized Interested Party, please refer to either the "Solo(k) Custodial Agreement," Section 3, or the "IRA Owner Agreement and Disclosure Statement," Additional Provisions, Section 1.*

## 1. Account Holder Information

Account Holder First Name   *Janet*      *Hope*   Middle  Last  *Simkins*                 Suffix

Date of Birth  ███████  Account # ███████  Social Security # ███████

## 2. Designated Representative Information  ☑ ADD the Designated Representative listed below to my account and replace the current Designated Representative.
☐ REMOVE the Designated Representative listed below from my Account.

Please complete the information below to designate a representative for your Account who, in addition to you (the Account Holder), **will have full authority to access the Account information and give PENSCO Trust Company investment and transaction instructions for the Account.**

☑ I would like a duplicate statement be mailed to this      Relationship to
Designated Representative.                                 the Account Holder

Firm Name

Contact First Name   *Dawn*    *L.*   Middle  Last  *Stanley*                    Suffix

Address   *P.O. Box 3482*

City   *San Rafael*                          State  *CA*   Zip Code  *94912*

Primary Phone #   ███████    Email Address   *dstanley @ trucktrailerfinance.com*

## 3. Authorized Interested Party  ☐ ADD the Authorized Interested Party listed below to my account and replace the current Authorized Interested Party.
☐ REMOVE the Authorized Interested Party listed below from my Account.

Please complete the information below to authorize an individual as your Authorized Interested Party (AIP). The AIP may access your Account information but has no investment or transaction authority over your Account.  By appointing the AIP and signing below, you are agreeing (1) to a modification of your PENSCO Trust custodial agreement to enable you to make this appointment for this purpose, (2) that you will have sole responsibility, and PENSCO Trust will have no responsibility for the selection, retention and actions of the AIP, (3) that the AIP will be your agent, and shall not be, and shall not be treated for any purpose as an employee, agent or affiliate of PENSCO Trust, or as controlled, approved, recommended or endorsed by PENSCO Trust and (4) that you may remove an AIP effective upon PENSCO Trust's receipt of your written notice of removal.

☐ I would like a duplicate statement be mailed to this      Relationship to
Authorized Interested Party.                              the Account Holder

Firm Name

Contact First Name                          Middle  Last                        Suffix

Address

City                                        State       Zip Code

Primary Phone #                   Email Address

| AUTHORIZED BY: | ⇒ | *Janet Hope Simkins* | | *6-27-05* |
| --- | --- | --- | --- | --- |
| | | Client Signature - Required | | Date |
| | ⇒ | *DLStanley* | | *6-23-08* |
| | | New Designated Representative Signature - Required | | Date |

AM-REP-03-1106

# EXHIBIT 12
# Axume Participation and Security Agreement

## PARTICIPATION AND SECURITY AGREEMENT

For value received in the amount of $66,753.70 receipt of which is hereby acknowledged, the undersigned Cornerstone Financial Services ("Assignor") hereby assigns, transfers and sets over to Pacific Premier Trust Custodian FBO Janet Simkins IRA ("Assignee") a divided participation ("Participation") in all remaining full rental payments ("Proceeds") now due and/or hereafter to become due to Assignor from (a) Abel A. Ramos Axume, Commercial Operator the ("Lessee") pursuant to the Equipment Lease Agreement dated January 25, 2024 activated March 20ᵗʰ, 2024 ("ELA") between Assignor as Lessor and Borrower as Lessee and (b) any guarantor(s) of the ELA.  Proceeds shall not include any payments to Assignor prior to this assignment or from Lessee for any extension or renewal of the ELA or any purchase of the leased equipment. The Beneficiary/Investor understands that Assignor will be the sole lienholder on the title(s) and will not be transferred to the beneficiary.  Beneficiary has authorized the Assignor to hold the original title(s) at their place of business.

The participation is equal to ten-percent (10%) simple interest fixed with quarterly interest disbursements through maturity.

| 1 | Interest | 07/28/2024 | $1,668.84 |
| 2 | Interest | 10/28/2024 | $1,668.84 |
| 3 | Interest | 01/28/2025 | $1,668.84 |
| 4 | Interest | 04/28/2025 | $1,668.84 |
| 5 | Interest | 07/28/2025 | $1,668.84 |
| 6 | Interest | 10/28/2025 | $1,668.84 |
| 7 | Interest | 01/28/2026 | $1,668.84 |
| 8 | Interest | 04/28/2026 | $1,668.84 |
| 9 | Interest | 07/28/2026 | $1,668.84 |
| 10 | Interest | 10/28/2026 | $1,668.84 |
| 11 | Interest | 01/28/2027 | $1,668.84 |
| 12 | Interest | 04/28/2027 | $1,668.84 |
| 13 | Interest | 07/28/2027 | $1,668.84 |
| 14 | Interest | 10/28/2027 | $1,668.84 |
| 15 | Interest | 01/28/2028 | $1,668.84 |
| 16 | Principal | 01/28/2028 | $66,753.70 |

Assignee shall have no right to collect the Proceeds and only Assignor shall be authorized to service the ELA and collect the Proceeds.  Late charges, if any, will be the sole possession of the Assignor.

Assignor shall exercise the same care in servicing the ELA and collecting the Proceeds as it exercises for the other EFA's in its portfolio and shall have no further responsibility to Assignee.  Assignor reserves the sole right to enforce the obligations of the Lessee pursuant to the ELA and may, in its sole and absolute discretion and without notice to or the consent of Assignee, modify the terms of the ELA (other than terms of payment) or exercise or refrain from exercising any powers or rights it may have under the ELA.  Earned interest accumulation discontinues on any subsequent prepayment of all outstanding ELA proceeds due. Interest and principal recovery are based on an equal interest, equal principal formula.

As security for the performance of all obligations of the Lessee under the ELA, Assignor hereby grants Assignee a security interest in and a lien on all of the Assignor's right, title and interest in the equipment, which is the subject of the ELA and is described in Schedule "A" of the ELA (the "Equipment").  Assignee acknowledges that it has entered into this Agreement following an assessment of the Lessee's financial condition and ability to perform its obligations under the ELA and that Assignor has made no warranty or representation regarding the Lessee's financial condition or ability to perform its obligations under the ELA.  Assignee acknowledges that Assignor has made no guaranty of the Lessee's ability to pay all of its obligations under the ELA and that Assignor has no duty to advise Assignee of any changes in the financial condition of the Lessee.

1

The liability of Assignor hereunder to collect and make payments to the Assignee and to perform all other obligations of Assignor hereunder is not limited solely to the Proceeds. Assignee shall have recourse against all other assets of Assignors, joint and several, in the event that payment of Assignee's share of the Proceeds is not sufficient to discharge fully the liability and obligations of Assignor hereunder. Assignee shall have further rights granted as security more fully explained in that certain Guarantee Agreement between Assignor and Assignee entered into on April 28, 1998 which is now incorporated into and made a part of this Agreement. Assignee shall have recourse to Assignor for any claims arising out of the breach by Assignor of any of its express representations and warranties.

Assignor warrants that the ELA is genuine and represents a valid obligation of a bona fide Lessee; all names, addresses, amounts, dates, signatures and other statements and facts contained therein are true and correct to the best of Assignor's knowledge; the Equipment has been delivered or installed, as applicable, and accepted by Lessee; the ELA and any guaranty in connection therewith are enforceable in accordance with their terms, except as limited by laws generally applicable to Lessor's rights and remedies; the ELA evidences a valid reservation of title to the Equipment effective as against all persons; the ELA complies in all respects with applicable laws and regulations and is and will be free from any liens, setoffs, counterclaims and other defenses. Assignor has properly and timely filed or recorded the ELA as required under all applicable filing and recording statutes. Assignor has the right to assign the ELA, and this Agreement conveys good title to the Participation free of all liens and encumbrances. It is expressly agreed that Assignee shall not have the right to assign, transfer or set over this Agreement and/or the Participation without the prior written approval of Assignor.

Assignor hereby certifies that the ELA constitutes the entire agreement between Assignor and Lessee and that no other assignment or security interest has been or will be granted with respect to the collateral or the monies assigned hereunder.

DATED:   04/15/2024          ASSIGNOR: Cornerstone Financial Services

BY:   _David Stone_
        David Stone (Apr 15, 2024 15:40 PDT)

DATED:_____        ASSIGNEE: Pacific Premier Trust Custodian FBO
                             Janet H. Simkins IRA

                             BY:_____

DATED:   04/15/2024          BENEFICIARY/INVESTOR: Janet H. Simkins

BY:   Janet Simkins (Apr 17, 2024 12:05 PDT)

2

# EXHIBIT 13

## April - June  2025
## Pacific Premier Statement

# Quarterly Portfolio Statement

**PACIFIC PREMIER TRUST**
A Division of Pacific Premier Bank

1801 California Street, Suite 800
Denver, CO 80202

April 1, 2025  -  June 30, 2025

**Janet Hope Simkins**

---

## NOTICES

### Withholding on IRA Distributions

The IRS requires that we provide the following notice to individuals who receive distributions from their IRAs:

- The distributions you receive from your IRA are subject to Federal income tax withholding unless you elect not to have withholding apply.
- Your election will remain in effect until you revoke it.
- You may elect not to have withholding apply to your distribution (or you may revoke or change an election) by completing a new Withholding Election Form. You may obtain a Withholding Election Form by going to our website **www.pacificpremiertrust.com** and using the Find a Form link. Please note, however, that withholding is generally required (i.e., you cannot elect out) if you are not a U.S. person, you have not provided us with a residence address, your residence address is outside the United States, or your distribution is to be delivered outside the United States.

Any election not to have withholding apply will be effective only for those distributions made after your election is received by us. Distributions following an election not to have withholding apply may be delayed until the election is processed by us.

Please note that if you elect not to have withholding apply to your distributions, or if you do not have enough federal income tax withheld from your distributions, you may be responsible for payment of estimated tax. You may also incur penalties if your withholding and estimated tax payments are not sufficient. We encourage you to consult with your tax advisor for more information about withholding on your IRA distributions.

*Continued on Next Page*

## Table of Contents

Account Overview................................................3

Portfolio Holdings..............................................4

Transaction Detail..............................................5

Supplementary Account Details............................6

Disclosures.......................................................7

**Janet Hope Simkins**





**Statement Message**

Coming Soon: Enhanced Login Security

To provide an extra layer of security for online account access, Pacific Premier Trust will implement Multi-Factor Authentication (MFA) in the coming weeks. MFA reduces the risk of unauthorized access by requiring users to prove their identities using more than one method.

ACTION REQUIRED: To prepare for the upcoming enhancement and ensure a smooth transition, please check your online account to ensure your email address and phone number are up to date. If you need to update your information, please call our Client Services Team at 800.962.4238 Monday through Friday, 7:00 a.m. - 5:00 p.m. MT.

Stay informed! Bookmark our enhancement update page on our website, PacificPremierTrust.com/Enhanced-Login-Security, for more information and answers to Frequently Asked Questions. You may continue to check the page for updates.

**Your Dedicated Client Services Team:**
Retail Premier Services    800.962.4238

**Accounts Included In This Statement**

███████████        Janet Hope Simkins

P055B9KL 00003044 20250702 240521947

**PACIFIC PREMIER TRUST**
A Division of Pacific Premier Bank

Janet Hope Simkins
April 1, 2025 - June 30, 2025

## Account Overview – ███████ Janet Hope Simkins

## Account Type: Traditional IRA

### Asset Allocation on June 30, 2025

| | Market Value ($) | Percent |
|---|---|---|
| ▪ Cash and Equivalents | 8,351.10 | 100% |
| Account Total | **$8,351.10** | **100%** |



*Liabilities may include negative portfolio balances, negative net cash balances, promissory notes, loans or other miscellaneous debt obligations of the account.*

### Activity Summary

| | This Period | Year to Date |
|---|---|---|
| Beginning Market Value | 550,986.11 | 549,919.52 |
| Additions | 0.00 | 0.00 |
| Withdrawals | 0.00 | 0.00 |
| Income & Capital Gain Distributions | 0.21 | 1,529.24 |
| Fees | -433.24 | -895.68 |
| Cash & Security Transfers | 0.00 | 0.00 |
| Investment Activity | 0.00 | 0.00 |
| Realized Gain/Loss | 0.00 | 0.00 |
| Cost Adjustments | 0.00 | 0.00 |
| Change in Value | -542,201.98 | -542,201.98 |
| Market Value on Jun 30, 2025 | **$8,351.10** | **$8,351.10** |

### Income Earned

| | This Period | Year to Date |
|---|---|---|
| Taxable Income | 0.00 | 0.00 |
| Tax-Exempt Income | 0.00 | 0.00 |
| Tax-Deferred Income | 0.21 | 1,529.24 |
| Total Income Earned | **$0.21** | **$1,529.24** |
| Total Short Term Realized Capital Gain/Loss | **$0.00** | **$0.00** |
| Total Long Term Realized Capital Gain/Loss | **$0.00** | **$0.00** |
| Total Realized Capital Gain/Loss | **$0.00** | **$0.00** |

*This summary is for your reference. It is not intended for tax-reporting purposes. Taxable income is taxable at the federal level and may be taxable at the state level.*

NON-DEPOSIT INVESTMENT PRODUCTS ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK OR ANY OF ITS DIVISIONS; AND ARE SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.

71



PACIFIC PREMIER
**TRUST**
A Division of Pacific Premier Bank

Janet Hope Simkins
April 1, 2025 - June 30, 2025

## Portfolio Holdings on June 30, 2025

| | Number of Shares | Share Price | Market Value | % of Account |
|---|---|---|---|---|
| **Cash and Equivalents** | | | | |
| US Dollar (Spot Currency:USD) | 8,351.10 | 1.00 | 8,351.10 | 100.00% |
| **Total Cash and Equivalents** | | | **$8,351.10** | **100.00%** |
| **Private Debt** | | | | |
| Axume Part Agmt 10% (Firm Defined Security ID:NTEHLNU4Y) | 66,753.70 | 0.00 | 0.00 | 0.00% |
| COLVIN SEC OTHER 10% (Firm Defined Security ID:NTERY7FKZ) | 61,152.75 | 0.00 | 0.00 | 0.00% |
| ESPARZA MIRAMONTES SEC OTHER 10% (Firm Defined Security ID:NTEJBHPLT) | 72,131.35 | 0.00 | 0.00 | 0.00% |
| Graves 2017 Prostar SEC 10% (Firm Defined Security ID:PT2221917) | 102,113.76 | 0.00 | 0.00 | 0.00% |
| Kumar Part Agmt 10% (Firm Defined Security ID:NTEJJSAAU) | 42,262.38 | 0.00 | 0.00 | 0.00% |
| OVIDIO VELASQUEZ GARCIA 10% PART AGMT (Firm Defined Security ID:NTE4J84KR) | 104,370.25 | 0.00 | 0.00 | 0.00% |
| Warren Part Agmt 10% AML (Firm Defined Security ID:NTEZJ7SMT) | 93,417.79 | 0.00 | 0.00 | 0.00% |
| **Total Private Debt** | | | **$0.00** | **0.00%** |
| **Portfolio Total** | | | **$8,351.10** | **100.00%** |

NON-DEPOSIT INVESTMENT PRODUCTS ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK OR ANY OF ITS DIVISIONS; AND ARE SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.

PACIFIC PREMIER
TRUST
A Division of Pacific Premier Bank



Janet Hope Simkins
April 1, 2025 - June 30, 2025

## Transaction Detail

| Trade Date | Transaction Description | Amount | Accrued Income | Realized G/L |
|---|---|---|---|---|
| Janet Hope Simkins | | | | |
| **Income & Capital Gain Distributions** | | | | |
| *Interest* | | | | |
| April 30, 2025 | Interest on USD For Period of 04/01/25 and 04/30/25 Due on 04/30/25 | 0.07 | | 0.00 |
| May 30, 2025 | Interest on USD For Period of 05/01/25 and 05/31/25 Due on 05/30/25 | 0.07 | | 0.00 |
| June 30, 2025 | Interest on USD For Period of 06/01/25 and 06/30/25 Due on 06/30/25 | 0.07 | | 0.00 |
| **Total Interest** | | **$0.21** | **$0.00** | **$0.00** |
| **Total Income & Capital Gain Distributions** | | **$0.21** | **$0.00** | **$0.00** |
| **Fees** | | | | |
| *Periodic & One Time Fees* | | | | |
| April 7, 2025 | Periodic Fee: Taken Quarterly $413.24 (01/01/25 to 03/31/25) Administration Fee: $413.24 Based on End of Period Market Value of $550,986.11: $550,986.11 @ 0.30% Total Annual Fee: $1,652.96. Account 000090899636: $413.24.  Charged now $413.24. | -413.24 | | 0.00 |
| June 5, 2025 | One Time Fee   $20.00,    Research/Special Service   $20.00, Ref 03465445 | -20.00 | | 0.00 |
| **Total Periodic & One Time Fees** | | **-$433.24** | **$0.00** | **$0.00** |
| **Total Fees** | | **-$433.24** | **$0.00** | **$0.00** |
| **Total        Janet Hope Simkins** | | **-$433.03** | **$0.00** | **$0.00** |

NON-DEPOSIT INVESTMENT PRODUCTS ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK OR ANY OF ITS DIVISIONS; AND ARE SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.



## Supplementary Account Details

### Required Minimum Distribution Summary

**Janet Hope Simkins**

| Prior Year End Market Value (Dec 31, 2024) | Amount Required to be Distributed for Current Year (Dec 31, 2025) | Amount Distributed Year to Date | Amount Remaining to be Distributed | Federal Withholding Tax Amount | State Withholding Tax Amount |
|---|---|---|---|---|---|
| $549,919.52 | $31,068.90 | $0.00 | $31,068.90 | $0.00 | $0.00 |

Amount Distributed Year to Date: Please note, this information is as of July 2, 2025, which means the amount may include transactions that have occurred after this statement period.

**Primary Owner / DOB:** Janet Simkins ▬▬▬▬

**Beneficiary / DOB / Relationship:** Scott R. Simkins- ▬▬▬▬ -Designated Non-Spouse

**Beneficiary / DOB / Relationship:** Leslie S. Komlosy- ▬▬▬▬ -Designated Non-Spouse

*Required minimum distribution data is as of July 2, 2025.*

NON-DEPOSIT INVESTMENT PRODUCTS ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR
OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK OR ANY OF ITS DIVISIONS; AND ARE
SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.



**PACIFIC PREMIER TRUST**
A Division of Pacific Premier Bank

Janet Hope Simkins
April 1, 2025 - June 30, 2025

## Disclosures

**Statements and Notices.** Account statements are made available each quarter. You must promptly review each statement when it is made available to you and notify us immediately of any errors or other discrepancies that may exist. If you fail to notify us of an error or other discrepancy that appears on your statement within 30 days of the date it is first made available to you, the statement will be deemed accurate and you will be responsible for any losses that result from your delay.

Statements and notices are normally sent to the last address listed with us for your account or, if you have requested electronic statements, made available to you through our Pacific Premier Wealth Online service. We also may send electronic notifications to your email address (e.g., to alert you when your most recent electronic statement is made available). You must notify us immediately in writing of any change in your address or email address. Statements and notices are deemed delivered and made available to you when they are first mailed, emailed, or made available through our Pacific Premier Wealth Online service. Notify us promptly if you do not receive your statement by the date you normally would expect to receive it.

Dividends or other income paid by an asset sponsor near a quarter-end may not appear until the following quarter's statement. If applicable, "brokerage value" may be reported as a cumulative total of all retirement plan assets held by your broker (i.e., not individually listed) and is based on information your brokerage firm provides to us.

**Physical Custody.** We may consolidate the information we receive from your financial representative, brokerage firms, asset sponsors (e.g., mutual funds, insurance companies, limited partnerships, banks, etc.), or others to report all assets held in your account. If we do, that does not necessarily mean we have physical custody of all such assets. Assets in your account may be held by your brokerage firms, asset sponsors, us, or others.

**Billing and Payment.** Pacific Premier Trust uses two methods of billing: invoice billing and direct charge. With invoice billing, we will send an invoice detailing the custodial fees and charges incurred on your account for the most recent quarter-end. The amount shown on your invoice will be due within 30 days from the invoice date.

We encourage customers with invoice billing to enroll for autopay through our Pacific Premier Wealth Online service to have invoices paid automatically each quarter. You can enroll for Pacific Premier Wealth Online service and setup your autopay preferences on our website at:   www.pacificpremiertrust.com.

We also offer the following alternative methods to pay your invoices:

- **Online:** You can schedule a one-time payment using the Pay Your Invoice link available on our website:   www.pacificpremiertrust.com.
- **Phone:** You can contact a member of our Client Services team at 800.962.4238 to arrange a one-time payment.
- **Mail:** You can make your payment by check (with your account number on the memo line) mailed to the following payment address:
    Pacific Premier Trust Processing Center
    P.O. Box 981012
    Boston, MA 02298

If you have selected our "direct charge" payment method and there is insufficient cash available in your custodial account to cover our fees and charges on the billing date, your payment method will changed to "invoice billing." If your account is converted from our direct charge payment method to invoice billing, you will not be allowed to switch back to direct charge unless there is at least $10,000 uninvested cash in your custodial account.

NON-DEPOSIT INVESTMENT PRODUCTS ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK OR ANY OF ITS DIVISIONS; AND ARE SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.

PACIFIC PREMIER
TRUST
A Division of Pacific Premier Bank

Janet Hope Simkins
April 1, 2025 - June 30, 2025

## Disclosures (continued)

**Required Minimum Distributions.**  If you are age 73 or over (or turning age 73 this year), you should be aware of an important IRS requirement that may apply to your account. According to IRS regulations, IRA owners who have turned age 73 are generally required to take an annual minimum distribution, known as a Required Minimum Distribution ("RMD"), unless special exceptions apply.

- If you have a traditional, SEP, or SIMPLE IRA and turn age 73 this year, you need to take your first RMD by April 1 of next year. You will also need to take next year's RMD by December 31 of next year.
- Traditional, SEP, and SIMPLE IRA owners who are over age 73 need to take their RMD by December 31 every year.

As required by law, we notify the IRS when accounts are subject to RMDs. We encourage you to consult with your tax advisor for more information about RMDs and related IRS requirements.  If you would like help calculating your RMD amount, please contact a member of our Client Services team at 800.962.4238.

**Annual Valuations.**  Federal law requires us to report the fair market value of each account under custody, including all assets in such accounts. Securities that have a publicly-quoted price are reported based solely on the quoted price, which is obtained from a quotation service or other source generally available to the public. For real estate assets, we must receive a valuation from a permissible third-party that satisfies our requirements. For non-real estate assets that do not have a publicly-quoted price, we normally request updated valuation information from the asset sponsor. If we do not receive updated valuation information from the asset sponsor, we may require your assistance to obtain that information. For all asset types we may exercise the rights and remedies available under our Custodial Agreement, including but not limited to, retaining a third-party to obtain the updated valuation information and charging you or your account for such costs, or requiring you to remove the asset from your account.

The value of assets listed on your December 31, year-end statement will be furnished to the Internal Revenue Service. Please keep a copy of that statement for your records.

**Unrelated Business Taxable Income.**  If a qualified retirement account has unrelated business taxable income ("UBTI") of $1,000 or more during the previous tax year, IRS regulations require the filing of an IRS Form 990-T. Common types of assets that may generate UBTI include the following:

- Partnerships, including limited partnerships, master limited partnerships, and publicly traded partnerships;
- Limited liability company interests when acting as an operating company and treated as a partnership for federal tax purposes; and
- Debt-financed real estate.

We encourage you to consult with your tax advisor for more information about UBTI and related IRS requirements.  If an IRS Form 990-T is required for your account, you must notify us immediately and cooperate with our requirements to validate or ensure the proper filing is made.

**No Reliance.**  We do not verify the information provided to us by your brokerage firm(s). We also do not guarantee: (i) the accuracy of valuations or prices obtained from brokerage firms, quotation services, or other sources, (ii) the continued availability of such values or prices, or (iii) your ability to obtain such values or prices in the event of a sale, redemption, or surrender. Valuation or pricing information provided or reported by us should not be used as a basis for acquiring, retaining, or disposing of an asset. Please refer to the reports (or other information) provided by your brokerage firm(s), asset sponsor(s), or other trusted sources with regard to the current valuation or pricing of your assets.

**Investment Responsibility.**  You, in conjunction with your financial representative, have sole responsibility and discretion to manage the assets in your account. As a directed custodian, our sole responsibility is to process instructions from you or your duly appointed financial representative. We do not give investment, tax or legal advice, provide retail investment products, perform independent asset valuations or appraisals, or maintain an agency relationship with your financial representative. Without limitation, we are not responsible for the performance of your assets.

**Safekeeping of Uninvested Cash.**  Uninvested cash is held by us in safekeeping pending one or more future events such as the payment of costs or fees associated with your account or assets, the payment of taxes, or the purchase of additional assets. Your uninvested cash amount is held by us, as custodian for your benefit, in an omnibus account maintained with Pacific Premier Bank.

NON-DEPOSIT INVESTMENT PRODUCTS ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK OR ANY OF ITS DIVISIONS; AND ARE SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.

**PACIFIC PREMIER TRUST**
A Division of Pacific Premier Bank

## Disclosures (continued)

This omnibus account is intended solely for the temporary safekeeping of client funds in anticipation of future events similar to those listed above and is not meant as an investment itself.

**FDIC Insurance.** Pacific Premier Trust is a division of Pacific Premier Bank. FDIC insurance coverage applies to your uninvested cash, which is aggregated with other deposits you maintain at Pacific Premier Bank for purposes of determining FDIC insurance limits. Any uninvested cash or other deposit amounts above the federal deposit insurance limit will not be insured by the FDIC. Also, FDIC insurance does not apply to non-deposit assets maintained in your custodial account. Please visit the FDIC's website at www.fdic.gov for additional information regarding deposit insurance, its coverage and limitations.

**Non-Deposit Investment Products.** Non-deposit investment products are not insured by the FDIC; are not deposits or other obligations of, or guaranteed by, Pacific Premier Bank or any of its divisions; and are subject to investment risks, including possible loss of the principal amount invested.

NON-DEPOSIT INVESTMENT PRODUCTS ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR
OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK OR ANY OF ITS DIVISIONS; AND ARE
SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.

77

Page 9 of 10

Disclosures (continued)

This page intentionally left blank.

NON-DEPOSIT INVESTMENT PRODUCTS ARE NOT INSURED BY THE FDIC; ARE NOT DEPOSITS OR
OTHER OBLIGATIONS OF, OR GUARANTEED BY, THE BANK OR ANY OF ITS DIVISIONS; AND ARE
SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

525 B Street, Suite 2200, San Diego, CA 92101

A true and correct copy of the foregoing document entitled (*specify*): **COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT UNDER 11 U.S.C. § 523(a)(2)(A) (FRAUD); § 523(a)(4) (LARCENY); AND § 523(a)(6)(WILLFUL AND MALICIOUS INJURY-ELDER ABUSE)**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **07/21/2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **07/21/2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| **DEBTOR** | **ATTORNEY FOR DEBTOR** |
|---|---|
| David Robert Stone<br>4310 Redwood Hwy, Suite 100<br>San Rafael, CA 94903 | Michael G. Spector<br>Law Offices of Michael G. Spector<br>2122 N. Broadway<br>Santa Ana, CA 92706 |

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 07/21/2025 | Barb Young | */s/ Barb Young* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                         **F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT IA NOTICE OF ELECTRONIC FILING (NEF)** CONTINUED:

Anthony Bisconti on behalf of Interested Party Courtesy NEF
tbisconti@bklwlaw.com, 1193516420@filings.docketbird.com,docket@bklwlaw.com

Charles L Doerksen on behalf of Creditor Westamerica Bank
cld@doerksentaylor.com

Anthony Dutra on behalf of Creditor Kataab Lateef
adutra@hansonbridgett.com, ssingh@hansonbridgett.com

Christopher Hart on behalf of Creditor Elizabeth Montgomery
chart@nutihart.com, admin@nutihart.com

Sarah Rose Hasselberger on behalf of Trustee Larry D Simons (TR)
shasselberger@marshackhays.com,
shasselberger@ecf.courtdrive.com;cbastida@marshackhays.com;alinares@ecf.courtdrive.com

D Edward Hays on behalf of Trustee Larry D Simons (TR)
ehays@marshackhays.com,
ehays@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com

Chris D. Kuhner on behalf of Creditor Frank P. Giorgi Revocable Trust
c.kuhner@kornfieldlaw.com

Paul J Laurin on behalf of Creditor Catherine Thomas
plaurin@btlaw.com, slmoore@btlaw.com;jboustani@btlaw.com;jose.barajas@btlaw.com

Paul J Laurin on behalf of Creditor Charles Dimick
plaurin@btlaw.com, slmoore@btlaw.com;jboustani@btlaw.com;jose.barajas@btlaw.com

Stacey A Miller on behalf of Creditor Porsche Financial Services, Inc. dba Bentley Financial Services and Creditor
Porsche Leasing Ltd.
smiller@tharpe-howell.com

Laila Rais on behalf of Trustee Larry D Simons (TR)
lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;lbuchanan@marshackhays.com;alinares@ecf.courtdrive.com

Vicki L Schennum on behalf of Debtor David Robert Stone
schennumlaw@icloud.com

Larry D Simons (TR)
larry@janus.law, c119@ecfcbis.com;nancy@lsimonslaw.com;simonsecf@gmail.com;keila@janus.law

Michael G Spector on behalf of Debtor David Robert Stone
mgspector@aol.com, mgslawoffice@aol.com

Edward A Treder on behalf of Creditor Wells Fargo Bank, N.A.
cdcaecf@bdfgroup.com

United States Trustee (RS)
ustpregion16.rs.ecf@usdoj.gov

Reilly D Wilkinson on behalf of Creditor Eric Steinberg, his successors and/or assignees
rwilkinson@scheerlawgroup.com, rwilkinson@ecf.courtdrive.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                      **F 9013-3.1.PROOF.SERVICE**

B1040 (FORM 1040) (12/24)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>JANET H. SIMKINS, as an individual and as Trustee of the JANET H. SIMKINS SURVIVOR'S TRUST | DEFENDANTS<br>DAVID ROBERT STONE |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>William A. Smelko (Bar No. 96970)<br>Maria K. Pum (Bar No. 120987)<br>PROCOPIO, CORY, HARGREAVES & SAVITCH LLP<br>525 B Street, Suite 2200, San Diego, CA 92101<br>(619) 238-1900 bill.smelko@procopio.com;<br>maria.pum@procopio.com | ATTORNEYS (If Known)<br>Michael G. Spector (145035)<br>LAW OFFICES OF MICHAEL G. SPECTOR<br>2122 North Broadway<br>Santa Ana, California 92706<br>Tel. (714) 835-3130<br>Fax. (714) 558-7435<br>mgspector@aol.com |
|---|---|

PARTY (Check One Box Only)

☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin
☒ Creditor      ☐ Other
☐ Trustee

PARTY (Check One Box Only)

☒ Debtor        ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor      ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

COMPLAINT FOR NON-DISCHARGEABILITY OF DEBT UNDER 11 U.S.C. § 523(a)(2)(A) (FRAUD); § 523(a)(4) (LARCENY); AND § 523(a)(6)(WILLFUL AND MALICIOUS INJURY-ELDER ABUSE);

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☒ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☒ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☒ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of remove d claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

☒ Check if this case involves a substantive issue of state law

☐ Check if a jury trial is demanded in complaint

☐ Check if this is asserted to be a class action under FRCP 23

Demand $ 1,192,201.98, plus interest, punitives & attorneys' fees

Other Relief Sought

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>DAVID ROBERT STONE dba CORNERSTONE FINANCIAL SERVICES | BANKRUPTCY CASE NO.<br>6:25-bc-12353-SY | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Riverside County | NAME OF JUDGE<br>Hon. Scott H. Yun |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ William A. Smelko | | |
| DATE<br>July 21, 2025 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>William A. Smelko | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.